Richard P. KUSHNER, et al., Plaintiffs,

v.

DBG PROPERTY INVESTORS, INC., et al., Defendants.

No. 89 Civ. 3132 (TPG).

United States District Court, S.D. New York.

May 5, 1992.

Marilyn Neiman, Beigel & Sandler, Ltd., New York City, for plaintiffs.

Barry J. Mandel, Baer Marks & Upham, Edward Brodsky, Spengler, Carlson, Gubar, Brodsky & Frischling, David Aronstam, McLaughlin & Stern, Ballen and Ballen, Jane Stevens, Gold, Farrell & Marks, New York City, David L. Cohen, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Peter Livingston, Ross & Hardies, Ronald H. Alenstein, Shea & Gould, Filip L. Tiffenberg, Bower & Gardner, New York City, for defendants.

## AMENDED OPINION

GRIESA, District Judge.

The motions before the court have been brought in 27 consolidated actions involving limited partnerships promoted by DBG Property Investors, Inc. A total of 31 limited partnerships are covered in these actions. Most of the actions attack a single limited partnership. A few of the actions relate to more than one partnership.

These are not class actions. The individual investors on whose behalf the actions are brought are named as plaintiffs. There are a total of over 200 plaintiffs in the actions.

The suits are brought under the federal securities laws, under RICO and under the common law.

■ In some of the actions the original complaints are still operative, and in some the complaints have been amended. Defendants in all the actions have moved to dismiss the complaints under Fed.R.Civ.P. 9(b) and (12)(b)(6). Since certain materials, particularly the private placement memoranda relating to the partnerships, have been submitted to the court and have been considered on these motions, the court will treat the motions as requesting summary judgment, as contemplated by Fed.R.Civ.P. 12(b). Defendants have also moved for sanctions.

The motions are granted.

### The Defendants

There is a group of defendants who are sued in all the actions. They are DBG Property Investors, Inc. and seven persons and entities connected with that company. These defendants include a law firm by the name of Fruitbine, Weiner, Harwin & Herman. This law firm is alleged to have participated in the preparation of the private placement memoranda and the procurement of certain appraisals of properties. Also, the individuals, Messrs. Fruitbine, Weiner, Harwin and Herman, are sued individually in certain cases.

Aside from the above law firm, no other professional entity is sued—*i.e.*, there are no claims against appraisers or accountants.

In addition to the eight defendants connected with DBG Property Investors, Inc., a total of 22 other defendants are named in various actions. These defendants include Ira D. Orshan, Jerome Rubin and Joel Katz, who were associated with Arandale Management Corp. and were co-promoters and co-managing partners of all or most of the partnerships.

### The Complaints

The complaints consist mainly of standard allegations repeated in all of the cases, varied, to a limited extent, to take into account certain facts alleged about particular partnerships.

These cases are mainly attacks upon the private placement memoranda. There are also claims that certain subsequent documents were issued to conceal the frauds perpetrated by the private placement memoranda. The claims are initially alleged under the federal securities laws.

There are also claims under RICO. Predicate acts are alleged under the federal securities laws and also under the federal mail fraud and wire fraud statutes. However, all the alleged predicate acts are claims of misrepresentation in connection with the private placement memoranda and the other documents. *See Stern* complaint, pars. 76–81.

In dealing with the present motions the court will first discuss certain groups of allegations which appear to be central to the claims of plaintiffs. The amended complaint in the *Stern* case will be used as a typical example of the other complaints. *Stern* involves the East Fifty–Sixth Street Associates partnership, the private placement memorandum of which is dated December 15, 1983.

Back-to-Back Transactions

a. *The Allegations*

Allegations about so-called "back-to-back transactions" are made with respect to all of the partnerships—except Rosalind Gardens, Heritage Associates and Brandywine

Associates—and in all the complaints except *Byrnes* and *Friar.*

The *Stern* complaint contains a section entitled "The Fraudulent Scheme." It is alleged that the partnerships were designed to yield sizeable benefits, which depended on the partnership having "a substantial fair market value basis in the property which it was to acquire." The complaint goes on to assert that in order to produce "an appearance to the investors that the limited partnerships' basis in the property was at the fair market value," the apartment building or other similar property was sold to the partnership "through affiliated intermediaries in nearly simultaneous, back-to-back transactions, at increasing higher prices, which resulted in a stepped up basis." These back-to-back transactions are said to have resulted in the partnership purchasing the property at an inflated price (*Stern* pars. 10–13). The allegations in this section are typical of the other complaints.

The *Stern* complaint also has a section entitled "The Back–To–Back Transactions." In the *Stern* complaint, it is alleged that DBG Property Corporation and one Arnold Gumowitz purchased the property from an outside party under an agreement dated October 20, 1983 for $14.7 million; that on December 5, 1983 Gumowitz assigned his interest to Rodeo, an affiliate of DBG Property Corporation, for $16.6 million; that on or about February 10, 1984 the partnership purchased the property from Rodeo for $20.1 million. It is alleged that the fair market value of the property was $14.7 million and that the purchase price paid by the partnership was inflated by at least $5.4 million (*Stern* pars. 16–24). Similar allegations are contained in the other complaints.

A later section in the *Stern* complaint is entitled "The Memorandum," referring to the private placement memorandum for the particular partnership. The section contains a summary of certain alleged representations contained in the private placement memorandum, followed by allegations as to how some representations in the memorandum were false, or failed to disclose material facts.

The *Stern* complaint, in paragraph 37(a), alleges that the memorandum for East Fifty–Sixth Street Associates represented to the investors that Rodeo would assign its rights under the property contract to the partnership for $20.1 million. Except for certain allegations about material in the memorandum regarding mortgages (a subject which will be dealt with later in this opinion), the *Stern* complaint gives no further indication that the memorandum contains material describing back-to-back transactions. The allegations in *Stern* are typical.

Paragraph 38 of the *Stern* complaint, containing allegations as to the falsity of the memorandum, has nothing in it directly relating to the back-to-back transactions. This is typical of the other complaints.

Paragraph 44 of the *Stern* complaint, in subparagraphs (i) and (j), alleges that the private placement memorandum failed to disclose that there was a series of purchases and sales transactions—*i.e.*, back-to-back transactions—at increasingly inflated prices so that the property was ultimately acquired by the partnership at an inflated price. Subparagraph (m) alleges that the memorandum failed to disclose that the fair market value of the property was no higher than the price paid in the first of the back-to-back transactions. These allegations are typical.

In the section of the *Stern* complaint entitled "Scienter," it is alleged that defendants knew, or recklessly disregarded, that the sale of the property by the affiliates to the partnership had "excessive mark-ups" (*Stern* par. 48(c)). Again, this is a typical allegation.

b. *Ruling*

■ The problem with the allegations in the complaints regarding the back-to-back transactions is that they ignore the extensive descriptions of such transactions contained in the private placement memoranda. It is indeed difficult to know how any attorney with the slightest recognition of the requirements of pleading, could draft

the allegations contained in these complaints on this subject. It goes without saying that a legal attack upon a document such as a private placement memorandum should give a fair description of what is contained in the memorandum on the relevant subjects. Without this, there can be no well grounded allegations of what is false or misleading about that memorandum.

■ With regard to the so-called back-to-back transactions, the allegations in the complaints purporting to describe the contents of the private placement memoranda are so deficient as to be nothing short of fraudulent. The fact is that the memoranda describe the back-to-back transactions in meticulous detail. The memorandum for East Fifty Sixth Street Associates, involved in the *Stern* case, fully describes the October 20, 1983 purchase of the property by Gumowitz and DBG Property Corporation for $14.7 million; the later assignment by Gumowitz of his interest to Rodeo for $16.75 million; the assignment of DBG's interest to Rodeo for nominal consideration; and the ultimate purchase by the partnership for $20.1 million (Memorandum p. 8). The parties to the transactions, their affiliation with DBG, and the other aspects of these transactions are fully set forth. In addition, the amount of the profit to be received by both Gumowitz and Rodeo at closing is stated in full (Memorandum pp. 9 and 60).

There is no showing of any claim of possible merit regarding the back-to-back transactions. There is no indication of any issue deserving trial. Defendants are entitled to summary judgment dismissing the allegations regarding the back-to-back transactions.

Wraparound Mortgages

a. *The Allegations*

There are allegations about the wraparound mortgages in all the complaints with respect to all the partnerships. In the section of the *Stern* complaint entitled "The Fraudulent Scheme," it is alleged that the partnerships used wraparound mortgages for the ostensible purpose of financing the purchase of the property, whereas in reality the wraparound mortgages were of no benefit to the partnerships or its limited partners and were a part of the scheme to defraud plaintiffs by generating profits for the promoters and their associates (*See Stern* par. 14). These allegations are typical of the other complaints.

In the section of the *Stern* complaint entitled "The Back–To–Back Transactions," there is an allegation that on February 10, 1984, when the partnership purchased the property from Rodeo, Rodeo received, as part of its profit on the sale, the difference between the interest rate on the wraparound mortgage and the aggregate interest paid on the underlying mortgages. It is alleged that the obligation of the partnership to Rodeo was secured by a wraparound mortgage in the amount of $15,600,-000 (*Stern* pars. 21–22). Attached to the *Stern* complaint are pages 44–50 of the private placement memorandum, dealing with the various mortgages. Similar treatment is contained in the other complaints.

There are certain allegations in the section of the *Stern* complaint entitled "The Memorandum," which incidentally allude to the wraparound mortgages but relate mainly to other points. *See Stern* pars. 37(a), (i) and (k), and 38(a) and (j). These allegations will be dealt with in other portions of this opinion.

In the portion of the complaints dealing with alleged omissions from the private placement memoranda, it is stated that the private placement memoranda failed to disclose that there was no legitimate economic reason for placing wraparound mortgages on the property, that the projections were inflated to conceal this fact, that the partnerships used wraparound mortgages to generate enormous profits for the promoters and their affiliates without any corresponding benefit to the limited partners, and that the wraparound mortgages burdened the property with excessive debt, which the reasonable income of the property could not support. *See Stern* pars. 44(a), (b), (*l*) and (k).

In the sections of the complaints addressing scienter, there is an allegation that the

defendants knew, or recklessly disregarded, that the issuance of the wraparound mortgages at rates several percentage points higher than the average rates of the underlying mortgages made it unlikely that projected outcomes would be realized (*See Stern* par. 48(d)).

b. *Ruling*

■ Unlike the situation with the back-to-back transactions, the complaints incorporate much of the detailed information in the private placement memoranda regarding the wraparound mortgages.

In dealing with defendants' motion in respect to the subject of the wraparound mortgages, the first point to note is that the complaints do not (with one or two isolated exceptions to be noted later) allege that any of the detailed descriptions in the memoranda about various mortgages, including the wraparound mortgages, are incorrect. Nor is there any claim that any specific detailed facts are omitted. The claims on this subject are that the private placement memoranda failed to disclose that the wraparound mortgages have no legitimate economic reason or benefit to the limited partners, and exist solely to generate "enormous profits for the promoters and their affiliates."

It is certainly true that the private placement memoranda nowhere arrive at such conclusions. But the issue is not whether the memoranda contain a particular damning epithet suggested by plaintiffs, but whether the *facts* about the mortgages are set forth truthfully and completely.

It must be concluded that the private placement memoranda did indeed set forth the facts regarding the mortgages in a full and accurate fashion. The details about the principal amounts, interest rates, duration, and identity of mortgagors and mortgagees, were laid out in meticulous detail as to both the underlying mortgages and the wraparound mortgages. Moreover, it was specifically disclosed that DBG and its affiliates were expected to earn profits from the wraparound mortgages. Quoted below is a paragraph from the memorandum involved in the *Stern* case (p. 60),

which is typical of the memoranda for all the partnerships. It is important to note that the allegations in plaintiffs' complaints ignore the existence of such statements in the memoranda.

Rodeo has a potential profit under the Partnership Wraparound Mortgage by virtue of the difference between (a) the interest to be paid by the Partnership to Rodeo pursuant to the terms of the Partnership Wraparound Mortgage and (b) the aggregate interest which Rodeo will be obligated to pay on the Underlying Mortgages pursuant to the terms of the Partnership Wraparound Mortgage. Because of the variable interest rates payable under the terms of the Second Mortgage, the Third Mortgage and the Partnership Wraparound Mortgage, Rodeo cannot estimate the amount of profit which it will realize by virtue of the foregoing (See "The Property—Mortgages on the Property" and "—The Partnership Wraparound Mortgage").

The conclusion is that the facts regarding the wraparound mortgages and their economic effect were sufficiently disclosed in the private placement memoranda. There is no issue deserving trial on this subject. Defendants are entitled to summary judgment dismissing the allegations regarding the wraparound mortgages.

Conflicts of Interest, Fees and Expenses

a. *The Allegations*

All of the complaints allege that defendants had conflicts of interest with respect to the partnerships and that defendants paid themselves excessive fees and expenses.

In the section of the *Stern* complaint entitled "The Fraudulent Scheme," it is alleged (par. 15) that the "property had excessive expenses which were in part generated by contracts entered into between the partnership and affiliates of the promoters of the partnership which were intended to direct excessive fees to the defendants," and involved conflicts of interest. As examples of this allegation, the *Stern* complaint alleges that the DBG partnership was to pay the following fees and commis-

sions to affiliates: $343,000 to the managing agent as a pre-paid management fee, and a percentage of annual gross rents collected; $330,000 to the managing general partner as a pre-paid fee; commissions to the real estate broker and the insurance broker; and commissions of $1,394,817 to the placement agent and other selling agents. These allegations, with variations in the dollar amounts of fees and expenses alleged for particular partnerships, are typical of the other complaints.

The section of the *Stern* complaint entitled "The Memorandum" contains the alleged misrepresentations and omissions on the subject of conflicts of interest, fees and expenses.

Paragraph 38(b) alleges that certain assurances about profits, tax benefits and projections were false "because enormous fees were to be taken by the promoters and their affiliates leaving inadequate monies in the partnership for the limited partners to share in." A later section of this opinion will deal with the issue of assurances about the future performance of the partnership. In addition to misrepresentations, the *Stern* complaint alleges that the private placement memorandum involved certain material omissions. Paragraph 44 of the *Stern* complaint, in subparagraph (c), alleges that the private placement memorandum failed to disclose that sales agents would not have recommended investments in the partnership in the absence of sales commissions. Subparagraph (e) alleges that the memorandum omitted to disclose that the "true purpose of the partnership was only to lure investors into the partnership in order to provide commissions and fees to the promoters of the partnerships and their affiliates." These allegations of misrepresentations and omissions are typical of the complaints.

Finally, the section of the *Stern* complaint captioned "Scienter" alleges that defendants were aware of, or were reckless in not knowing about, the above misrepresentations and omissions. The *Stern* complaint alleges that defendants were aware that "a disproportionately large percentage of the monies raised were designated to be up front payments to the promoters or their affiliates and the amounts so designated bore no fair relationship to the services for which they were purportedly given." Similarly, the *Stern* complaint alleges that defendants knew or should have known that "based upon the high percentage of up-front fees taken by the promoters and their affiliates and the large wraparound mortgages, that it was improbable that the property would meet the projections" (*Stern* pars. 47(c) and 48(g)). These allegations are also typical.

### b. *Ruling*

The allegations in the complaints ignore the fact that the private placement memoranda repeatedly disclose the inherent conflicts of interest, and the substantial fees and expenses to be paid affiliates. The first page of the private placement memorandum involved in the *Stern* action, like the first page of all the memoranda, warns, in block letters, that "AN INVESTMENT IN THE INTERESTS INVOLVES A HIGH DEGREE OF RISK, POTENTIAL CONFLICTS OF INTEREST AND PAYMENT OF SUBSTANTIAL FEES TO THE GENERAL PARTNERS OF THAT PARTNERSHIP AND THEIR AFFILIATES" (p. 1). This introductory warning is only the beginning.

Three sections of the private placement memorandum involved in *Stern* specifically treat the subject of conflicts of interest. The memorandum contains a separate section entitled "Conflicts of Interest" which discloses, at length, the "inherent conflicts of interest due to the fact that D.B.G., Rodeo, the Managing Agent and the Placement Agent are Affiliates of the Managing General Partner" (pp. 17–19). This section repeatedly warns that the terms of the offering were established without arm's length negotiation. This disclosure is contained in all of the memoranda.

Likewise, paragraph 16 of the "Risk Factors" section in the *Stern* memorandum is also captioned "Conflicts of Interest." This paragraph offers the warning that "potential conflicts of interest exist between the individual interests of the Gener-

al Partners and their Affiliates on the one hand, and the interests of the Partnership and the Investors on the other" (p. 30).

These general warnings of conflicts of interests are supported by an exhaustive disclosure of the relationships between all the participants in a section in the *Stern* memorandum captioned "Participants" (pp. 51–58). This section discloses the names and backgrounds of all individual participants and also the officers of all corporate entities. Among other things, the affiliate status of the general partners, the managing general partner, the managing agent, and Rodeo is explored. The role of the law firm, Fruitbine, Weiner, Harwin & Herman, P.C., is disclosed, along with the fact that Messrs. Fruitbine, Weiner and Herman are directors and officers of the Managing General Partner, DBG Property Corporation, and the Managing Agent.

The fees and expenses are given exhaustive treatment in the *Stern* memorandum. For instance, in the "Summary of the Offering" found in the beginning, under the subheading "Compensation to the General Partners and their Affiliates," the memorandum states that the general partners and their affiliates will receive "substantial fees in connection with the Offering, the operation of the Partnership and the sale and/or refinancing of the Property" (p. 6).

The prospective investor is referred to the sections of the memorandum captioned "Use of Proceeds" and "Compensation to the General Partners and Their Affiliates." Between these two sections, the fees paid to affiliates are described in exhaustive detail (pp. 12–15 and 59–61). The managing agent's prepaid fee of $343,000 is disclosed (pp. 13 and 60). The managing general partner was to receive a pre-paid fee of $300,000 at the closing of the partnership, and the general partners' salary is stated as being $330,000 a year (p. 59). The affiliate status of, and commissions to be paid to, the real estate broker and the insurance broker are similarly disclosed (pp. 59–60).

■ To return to the allegations in the complaint, it is alleged that there was a fraudulent scheme to have certain fees paid to affiliates. It can hardly be a fraudulent scheme if it was disclosed. The fees and expenses to be paid to the managing agent, the managing general partner, the real estate broker and the insurance broker are all described.

■ There are slight discrepancies in the nomenclature and in the dollar amount of one payment alleged as examples of a fraudulent scheme in the *Stern* complaint (par. 15). These differences are not, however, material. There is no attempt through these allegations to allege falsity in the memorandum because of these differences. Every single payment is stated in the memorandum except for one point; in the *Stern* memorandum, there is no mention of the managing agent receiving a percentage of annual gross rents collected. In a number of the memoranda, this payment is disclosed (*See, e.g.,* Alley Pond Associates Memorandum, p. 51; Amherst Associates Memorandum, p. 76). This presents a *de minimus* issue in the overall picture.

Other than this one discrepancy, the very fees and expenses, described as the basis of a fraudulent scheme in paragraph 15 of the *Stern* complaint, are repeatedly disclosed in the East 56th Street Associates private placement memorandum. This disclosure is typical of all of the private placement memoranda attacked in the complaints.

■ The general, conclusory claims about misrepresentations and omissions in connection with the conflicts of interest, fees and expenses are of no weight in light of the extensive disclosure. The complaint gives no recognition of such disclosure and makes no real attempt to specify in any way the respect in which it is wrong. Indeed, the allegation in the complaints that defendants committed fraud by not "disclosing" that sales agents would not have recommended the partnership interests in the absence of commissions is ludicrous. *See Brown v. The E.F. Hutton Group,* 735 F.Supp. 1196 (S.D.N.Y.1990).

In conclusion, the facts regarding the conflicts of interest and the fees and ex-

penses were exhaustively disclosed in the private placement memoranda. There is no indication of any issue deserving trial regarding these claims of misrepresentation and omission. Defendants are entitled to summary judgment dismissing the allegations regarding the conflicts of interest and the fees and expenses.

Expectation of Profit and Tax Benefits

a. *The Allegations*

Each of the complaints alleges that the private placement memoranda represented that the offering was conducted with an expectation of profit and tax benefits.

The *Stern* complaint is typical of the other complaints on this topic. The allegations concerning profit and tax benefits are found in the section of the *Stern* complaint entitled "The Memorandum". The complaint (par. 37) purports to characterize the representations in the East 56th Street memorandum. It alleges (par. 37(b)) that the offering memorandum represented to investors that "the partnership was conducting its activities with an expectation of profit." The complaint refers "by way of illustration [to] the section of the Memorandum captioned 'Profit Objective.'" The complaint alleges (par. 37(c)) that the memorandum represented to investors that "the investments in the partnership were secure, were potentially profitable and would provide substantial tax benefits." Finally, the *Stern* complaint (par. 37(d)) alleges that the memorandum represented that "there would be a significant pre-tax economic return to the investors (see by way of illustration the projections)".

Paragraph 38 of the *Stern* complaint alleges that these representations in the memorandum were false in that

an investment in the partnership was not secure, would not meet the profit projections and would not provide substantial tax benefits and the projections in the Memorandum were false, because enormous fees were to be taken by the promoters and their affiliates leaving inadequate monies in the partnership for the limited partners to share in.

It is further alleged that the representations were false because "there would not be significant pre-tax economic returns to the investors."

The *Stern* complaint alleges (par. 44(f)) that the private placement memorandum failed to disclose "that the significant profits promised to investors were impossible to attain," and (par. 44(aa)) "that there would not be significant pre-tax economic returns to the investors."

b. *Ruling*

█ The allegations in the complaints concerning the supposed profit and tax benefits utterly fail to reflect the reality of the representations in the private placement memoranda.

Although the complaints refer to a section of the private placement memoranda said to be entitled "Profit Objective," at least in the memorandum involved in the *Stern* case the court can find no section with such a title.

Instead, in a sub-section of the offering summary, entitled "Investment Objectives and Policies," the *Stern* memorandum represents that the partnership's investment objectives are "potential increases in equity, potential appreciation in the value of the property, and current tax benefits" (p. 10–11).

However, this is qualified with numerous warnings. In addition to the introductory descriptions of risks described earlier, the memorandum contains an additional ten-page section entitled "Risk Factors" (pp. 22–32). In this section the memorandum warns that there "is no guarantee or assurance that any return will be achieved or maintained for a specific time" (p. 22). This warning is repeated throughout the memorandum, often in bold, capital letters.

The memorandum contains both general and specific warnings against definite reliance on tax benefits. The memorandum begins by warning that:

THERE ARE SUBSTANTIAL RISKS RELATING TO THE AVAILABILITY AND AMOUNT OF TAX BENEFITS

RESULTING FROM AN INVESTMENT IN AN INTEREST.

\* \* \* \* \* \*

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX TREATMENT WHICH MAY ACCRUE TO THE INVESTORS.

(pp. iii–iv). In the "Risk Factors" section, in a sub-section entitled "Certain Tax Risks" (p. 23), the memorandum repeats that "no representation or warranty of any kind is made" with respect to any tax consequences described.

The potential tax benefits are described at length in a section of the memorandum entitled "Federal Income Tax Aspects" (pp. 62–90). The tax treatment described is an opinion of counsel only. It is explained that the IRS had made no ruling on the taxable status of the partnership prior to the offering, and that the tax laws were subject to change. The opinion of counsel also describes the tax treatment that could result in the event the IRS ruled otherwise than expected. The section concludes with a warning in capital letters that prospective investors should consult their own advisors (p. 89–90). This disclosure is typical of all of the private placement memoranda.

It seems to be no accident that the complaints fail to quote from the offering memoranda, or to cite to specific pages from these voluminous documents since the alleged representations made by the offering memoranda are nowhere to be found therein.

Plaintiffs are without question entitled to summary judgment on the allegations of fraud relating to the subject of profit and tax benefits. *See Friedman v. Arizona World Nurseries Ltd.*, 730 F.Supp. 521, 541 (S.D.N.Y.1990), *aff'd*, 927 F.2d 594 (2d Cir.1991). The complaints are blatantly irresponsible in failing to deal in any fair way with the documents—the private placement memoranda—which are said to have constituted the fraud.

Assumptions and Projections

a. *The Allegations*

All of the complaints allege that the private placement memoranda contained "false and misleading assumptions that were used in the preparation of the projections" (*Stern* par. 36).

The *Stern* amended complaint contains typical allegations on this subject. Except for two allegations of scienter (par. 48), all of the allegations concerning the assumptions and projections are located in the section of the complaint entitled "The Memorandum" (pars. 37–44).

The complaint states that the memorandum made certain representations to investors. The complaint alleges (par. 37(d)) that the memorandum represented that projections demonstrated certain financial outcomes, namely that:

(i) there would be substantial distributions to limited partners;

(ii) there would be sufficient cumulative working capital;

(iii) there would be significant positive cash flow;

and, (iv) there would be significant tax deductible losses in the initial years of each investment.

The complaint also alleges that the private placement memorandum made certain representations about the rental and vacancy rates of the property. The complaint alleges the memorandum represented that the projections "were based on reasonable assumptions" such as that:

(i) future net rents would increase; and

(ii) vacancy rates were based upon available information, present circumstances and management's judgments about the most likely outcomes;

The complaint also alleges that the memorandum represented that "the annual gross rentals would cover the underlying debt service." The subparagraph refers the reader "by way of illustration" to the legal opinion attached to the memorandum. *See* par. 37(f)–(g).

Finally, the complaint alleges that the memorandum made assurances about the "significant residual value" of the property

in excess of the future balance of the wraparound note. *See* par. 37(i) and (k).

The complaint alleges that the representations described above were false because the

assumptions of net rents were knowingly inflated and vacancy rates understated by defendants. These were unsupported by the past business history of the property which showed the net rents to be substantially less and the vacancy rates to be substantially higher than those assumed.

The complaint alleges that the representations were also false because "the annual gross rentals would not cover the underlying debt service." *See* pars. 38(d)–(e).

The complaint alleges that the representations described above were false because "projections were not based on reasonable assumptions and were not based on available information, present circumstances and management's judgments about the most likely outcomes." *See* par. 38(f).

The next paragraph makes two additional allegations of misrepresentation concerning the assumed rents and vacancy rates (par. 39). It alleges that the assumption of net rents in 1984 of $1,700,000 and increasing at 7% thereafter was "knowingly false in view of annual gross rents for 1983 of only approximately $1,600,000 and the intention to convert the property to cooperative units which would result in increased vacancies." It also alleges that the assumption of a vacancy rate of zero was "knowingly false in view of the fact that there must be some turnover in apartments creating some vacancies and because of a possible downturn in the market."

The complaint alleges (par. 40) that the memorandum represented that "the projections were based upon available information, present circumstances, and management's judgments about the most likely outcomes." The complaint concludes that this representation was false because the projections were based upon "knowing omissions", since defendants believed the financial projections would not be achieved. *See* pars. 41(a)–(c).

The *Stern* complaint alleges that the memorandum represented that the projections were "subject to cautionary language." The complaint alleges that this representation was "false because the defendants knew the assumptions ... were false." *See* pars. 42–43.

The alleged omissions from the private placement memoranda are the failure to disclose: that the projections were based on unreasonable assumptions, including the assumption that gross income would increase by 7% and that there would be no vacancies; sufficient information to evaluate the rental and occupancy rates of the premises and adjacent properties; the discounted cash flow analyses on the property; an analysis of the local real estate market; and that there would not be significant residual value of the property in excess of the future balance of the wraparound mortgage note. *See* pars. 44(*o*), (r)–(x) and (bb).

The complaint alleges that the defendants knew or were reckless in not knowing that the projections were not based upon a sound factual or historical basis, or upon the "necessary information". *See* pars. 48(e)–(f).

b. *Ruling*

██ The main text of each private placement memorandum contains projected capitalization figures, descriptions of federal income tax aspects, allocations of profits and losses to partners, and schedules for cash distributions. Attached to each private placement memorandum is an exhibit containing certain projected financial statements (*See e.g. Stern* Exhibit VIII). It will be assumed that the figures in both the memoranda and also the exhibits comprise the projections and assumptions referred to in the complaints.

It must be noted at the outset that there are no allegations that any of the calculations of projections or assumptions are suspect. Thus, while the complaints refer to representations about distributions to limited partners, working capital, cash flows, rentals and vacancy rates, the complaints do not take issue with the method of calcu-

lation of these figures. For instance, the East 56th Street memorandum discloses that $2,018,700 is to be initially allocated for working capital (p. 14). There is no allegation that there was any fraud in the presentation of this figure.

Instead, the complaints allege that the memoranda represented that the distributions, working capital, cash flows, rentals and vacancy rates would all be "significant" and "sufficient". The private placement memoranda do not, however, use such adjectives to describe the projections and assumptions. Once again, the complaints fail to reflect the disclosure in the memoranda.

The memorandum underlying the *Stern* complaint begins the section on "Risk Factors" with the following warning (p. 22):

1. *Assumptions.* The description of the contemplated results of operations of the Partnership included in the Memorandum and in the exhibits hereto is based upon assumptions concerning factors over which the Partnership and/or the General Partners will have no control. These factors include, but are not limited to: the application, interpretations and continuing advantages of certain provisions of the Federal income tax laws; high rates of occupancy of the Property, which may be adversely affected by general and local economic conditions, and excess of supply of residential units and/or commercial space, and changes in the relevant market area.

The *Stern* memorandum continues by enumerating the "General Risks of Real Estate Ownership", in which it states that "the cost of operating the Property may exceed the rental income earned therefrom." It adds (p. 22) that the

ability of the Partnership to meet its debt and other obligations or thereafter to make distributions to the Investors will depend on these factors. In the event mortgage payments are not met, the Partnership may sustain a loss of its equity investment in the Property as a result of a foreclosure of the Underlying Mortgages. No guarantee is made with

respect to the favorable operation of the Property, the amount of the future income or loss of the Partnership, the cash available for distribution to Investors or the Projections.

This disclosure contradicts the allegations that the memoranda represented that there would be "substantial distributions to limited partners" (*Stern* par. 37).

Another warning (pp. 22–23) is issued under the subheading of "Operational Risks":

Any return to Investors will depend upon the success of the Partnership in generating revenues in excess of operating costs and debt service payments.... All of the apartments are, and all of the commercial space is, occupied. Investors should be aware that the Projections assume rental of 100% for the residential space and 100% occupancy for the commercial space. However, no assurance can be given that these assumptions will turn out to be accurate....

Further, if rents and occupancy levels are not adequately maintained, the Partnership might not be able to meet mandatory payments of debt service, thereby resulting in possible foreclosure of the Partnership Wraparound Mortgage.

This statement directly contradicts the allegations that the memorandum represented that the assumptions of rental and vacancy rates were realistic, or that "the annual gross rentals would cover the underlying debt service." *Stern* pars. 37(f)–(g).

The "Risk Factors" section continues with further disclosure. A section on the "Use of Leverage" contains the following underlined warning: *"There can be no assurance that the cash flow of the Partnership will be sufficient to service the mortgage debt pursuant to the terms of the Partnership Wraparound Mortgage"* (p. 28). Again, this statement flies in the face of the allegations that the memoranda represented "there would be significant residual value of the property in excess of the future balance of the wraparound mortgage note." *Stern* par. 37(i).

The "Risk Factors" section also contains a subsection entitled "Limitation on Rental

Increases" (p. 31–32) which warns that the apartments are subject to rent control. The memorandum states that the current rent control laws limit rental increases on lease renewals to 4% for one-year renewals and 7% for two-year renewals. The subsection adds that

no allowance is made for any additional increase in rent upon the vacancy of an apartment unit.... As a result, cash revenues from rental of apartment units in the Property may not be sufficient to pay current expenses of the Property and to pay debt service under the Partnership Wraparound Mortgage.

No assurance is made that the rentals will provide sufficient cash flow to meet the projections.

The "Risk Factors" section concludes with a subheading on "Limited Negative Cash Flow Loan Commitment" (p. 32). The memorandum states that except for obligations to arrange for loans if the working capital is depleted,

there are no guarantees by the General Partners or their Affiliates with respect to funds necessary to meet the operating expenses of the Partnership or operating deficits. Additionally, there is no assurance that in the future the General Partners will have the financial resources necessary to meet their undertakings.

This is hardly an assurance that there will be "significant positive cash flow" as alleged in the complaints. *Stern* par. 37(d).

In a section entitled "Projections", the *Stern* memorandum states that the projections in Exhibit VII "are presented for illustrative purposes only" (p. 89). The disclaimer reiterates that the projections "are merely estimates, are not guaranteed and should not be relied upon."

In the section entitled "Distributions to Investors by the Partnership," the memorandum describes the order of priority for distributions of available cash. The memorandum repeats that these projected distributions "have been prepared on the basis of assumptions and hypotheses favorable to Investors solely for the purpose of illustration" (p. 91). The section concludes with the words, "there can be no assurance that

upon liquidation of the Partnership there will be sufficient cash proceeds to make any of the foregoing distributions" (p. 95).

Annexed to the private placement memorandum for the *Stern* complaint are projections representing estimates of income, expense and cash flow (Exhibit VIII). The exhibit begins (p. 2) with repeated disclaimers in upper-case letters, of which the following is a typical example:

THE ACCOMPANYING PROJECTIONS ARE AN ILLUSTRATION OF FINANCIAL RESULTS BASED ON ASSUMPTIONS WHICH ARE NOT NECESSARILY THE MOST LIKELY. THE PROJECTIONS ARE PREPARED TO ILLUSTRATE WHAT WOULD HAPPEN IF THE ASSUMPTIONS CONTAINED HEREIN WERE TO OCCUR.

A long list of notes and assumptions precedes these financial statements. Included in these notes and assumptions is an explanation of the calculation of the projected annual gross income for the year following the offering as totalling $1,700,-000 (Ex. VII p. 3). This figure is derived from the sum of projected "gross potential apartment income" of $1,400,000 and commercial space income of $300,000. The following explanation accompanies this calculation:

The Projections assume that total income will increase by 7% each year over the prior year and that there will be no vacancy factor because presently the Property is fully occupied. There can be no assurance that income will increase by 7% or that the Property will continue to be fully occupied.

The allegations on the topic of assumptions and projections bear a close relationship to the allegations based on future assurances of profit. The allegations suggest that the memoranda made firm assurances that the figures would eventually become reality. The assurances do not exist in the memoranda and no misrepresentations were made.

The rental and vacancy rate projections are fully explained. Specific disclaimers are made about these projections. The memoranda warn that the assumptions of

rental increases of 7%, and of full occupancy, may be unrealistic.

The complaints allege that the private placement memoranda omitted to disclose sufficient information to evaluate the rents, the real estate market, adjacent properties, and the cash flow. However, some information was provided on most of these topics. In addition, the memoranda repeatedly invite interested parties to request additional documents, such as the appraisals (East 56th St. Mem. at 108).

Summary judgment is granted to defendants on the claims of misrepresentations and omissions based upon assumptions and projections. No allegations have been made which warrant trial on this subject.

Maintenance

a. *The Allegation*

Each complaint alleges that the private placement memoranda specify that a certain sum of money is to be used for maintenance of the properties. The complaints allege that this representation was false because "the sums of monies specified in the Memorandum to be used for maintenance of the property were not intended to be so used and were intended to be diverted for other purposes." *Stern* pars. 37(e) and 38(c).

b. *Ruling*

■ The allegations about the sums of monies specified for maintenance again misstate the representations in the private placement memorandum.

In the "Use of Proceeds" section, each memorandum states that a certain sum (e.g. $200,000 in East 56th St. Mem. at 14) is to be allocated for maintenance, initial repairs and capital improvements. No sum is allocated for maintenance alone.

In a section entitled "Risk Factors", under the subheading of "Operational Risks", the East 56th Street memorandum (p. 23) states the following:

> The Partnership has allocated $200,000 of the proceeds of the Offering to initial repairs and maintenance and capital improvements. The Partnership has made provisions for this amount in the belief that there has been only a minor amount of deferred maintenance with respect to the Property which should be accomplished during 1984. (See "The Property—Description.") There can be no assurance that this amount will be sufficient for such purposes.

This disclosure is typical of the other private placement memoranda. It is clear that the sum specified for maintenance, repairs and improvements is represented as only an estimation of need.

The complaints offer no explanation of the factual basis for their allegations of fraudulent intent. Indeed, they provide no facts or figures to show that the maintenance money was ever diverted for other purposes.

Defendants are entitled to summary judgment on the allegations of fraudulent intent with regard to the maintenance fees.

Fair Market Value and Appraisals

a. *The Allegations*

All of the complaints make allegations of fraud that refer to the fair market value of the partnership properties and to appraisals of those properties.

The allegations in the *Stern* complaint about fair market value and appraisals are typical of all the complaints. In *Stern,* these allegations are contained in the section of the complaint entitled "The Memorandum".

The *Stern* complaint alleges that the East 56th Street memorandum represented that

> the fair market value of the property at the time of the offering exceeded the principal of the wraparound mortgage note; and the future estimated fair market value of the property would exceed the principal balance of the wraparound mortgage note and accrued interest thereon (see by way of illustration the representations in the legal opinion attached to the Memorandum and the projections).

The complaint alleges that this representation was false in that

the fair market value of the property at the time of the offering did not exceed the principal of the wraparound mortgage note, and the future market value of the property would not at all times exceed the principal balance of the wraparound mortgage note and accrued interest thereon.

*Stern* pars. 37(k) and 38(j).

The complaint alleges that the memorandum represented that "the partnership would at all times have an equity investment in the property." The complaint alleges that this was a misrepresentation because "the partnership did not at all times have an equity investment in the property, because the purchase money indebtedness of the property exceeded its fair market value." *Stern* pars. 37(j) and 38(k).

The *Stern* complaint also alleges omissions on this topic. The complaint alleges that the memorandum failed to disclose "that the fair market value of the property was no higher than what each entity affiliated to the partnership had purchased it for in the first of each of the back-to-back transactions." *Stern* par. 44(m).

The complaint alleges the East 56th Street Associates memorandum failed to disclose "that there was often no appraisal of the property available to investors despite the fact that an appraisal was represented in the Memorandum to be available to investors." *Stern* par. 44(q).

The complaint alleges that the memorandum omitted to disclose that the partnership did not at all times have an equity investment in the property, "because the purchase money indebtedness of the property exceeded its fair market value"; and that the fair market value of the property at the time of the offering did not, nor would it, exceed the principal of the wraparound mortgage note. *Stern* pars. 44(cc)–(dd).

The *Stern* complaint concludes the section on "The Memorandum" by alleging (par. 45) that the memorandum failed to disclose the following material facts:

(a) the method used in the appraisal of the property;

(b) that use of a Market Data Appraisal approach, whereby sales of corresponding properties are used to arrive at a value for the subject property, would not result in a fair appraisal, because key tax benefits to the limited partners would only be realized if the partnership property was not sold in the early years of the partnership and therefore, any appraisal should include a discussion about value based on anticipated revenues and benefits; and

(d) that use of a Capitalization of Earnings Appraisal approach, whereby earnings are capitalized into present value using a rate based on financial risk, inflation and real return of investment would have resulted in a determination that the sale price of the property to the partnership had been overvalued.

These misrepresentations and omissions, alleged in the *Stern* complaint, are typical of the other complaints.

A few of the complaints, in addition to containing the allegations in the *Stern* complaint, contain another allegation of misrepresentation about the appraisals. The *Roman* complaint, for instance, alleges that the private placement memorandum for the Briargate Associates partnership contained the following statement:

The partnership has received an appraisal from an independent appraiser indicating that the fair market value of the property equals or exceeds the purchase price of $12,240,000 (see page 61 of the memorandum).

The complaint alleges that this representation was false because "the fair market value did not exceed or equal the purchase price paid by the partnership and the appraisal was not from an independent appraiser." *Roman* pars. 23(k) and 24(k).

In their papers submitted on the present motion, plaintiffs maintain that an issue of fact exists on the subject of the appraisals. Plaintiffs have submitted an affidavit from Brian Greenman, an appraiser, who concludes that the partnerships did not purchase the properties at fair market value. Mr. Greenman assumes that fair market value must have been the price paid for

each property to the original seller by the intermediate purchaser. Mr. Greenman arrives at this conclusion by inference. He affirms that the higher prices paid by each partnership for the property only a short time after the initial sale are evidence of fraud.

b. *Ruling*

Plaintiffs' allegations about appraisals entirely miss the point. Plaintiffs did not buy their interests in the partnerships in reliance on representations that the purchase price of each property was supported by an appraisal. In fact, the appraisals were hardly mentioned at all in the private placement memoranda.

Some of the private placement memoranda do refer to appraisals. These memoranda do not, however, represent that the appraisals were "fair" or "accurate". The memoranda vouch only for the independence of the appraising firm. The memorandum for Briargate Associates represents (p. 61):

> The Partnership will purchase the complex for $12,240,000 and has received an appraisal from an independent appraiser indicating that the fair market value of the Property equals or exceeds such purchase price.

In the discussion of federal income aspects, the Briargate memorandum later adds (p. 101) that:

> Although Counsel is unaware of any reason to believe that the appraisal, conducted by an expert in the field, is erroneous, no assurance can be given that the [Internal Revenue] Service will not contend that the purchase price of the Property exceeds the fair market value thereof. . . .

No appraisals were attached to any of the private placement memoranda. Appraisals for 26 of the 30 partnerships, however, have been attached as exhibits to defendants' motion for summary judgment. Not attached are the appraisals for Riviera Resort Hotel Associates, Stoneridge Associates, Country Place Associates, and Tampa Way Associates.

Each appraisal was conducted by either: (1) James H. Burns Co., a division of the real estate firm of Douglas Elliman Knight Frank Inc.; or (2) Joseph J. Blake and Associates, Inc. These firms are not named as defendants. Nor do the complaints allege that these appraisal firms in any way conspired with defendants.

Plaintiffs do not dispute that the appraisals produced by defendants were those in existence at the time of each offering.

The appraisals of the East 56th Street Associates property is illustrative of the other appraisals. It was made by the James H. Burns Company as of December 9, 1983. It discussed three methods of estimating market value, and it defined market value as "the highest price in terms of money which a property will bring in a competitive and open market and under all conditions requisite to a fair sale" (p. 1).

The appraisal first employed the Market Approach to Value, which involved the gathering and analysis of comparable sales data for eight properties. The appraisal provided detailed information about the location of the property, housing and employment trends in Manhattan, zoning, taxes, improvements, and land sales of similar sites. The value under the Market Approach was estimated as $20,400,000.

The East 56th Street Appraisal next considered the Income Approach to Value. This approach examines the net income that a property is capable of producing. The appraisal shows revenue data from rents and shows expenses. After multiplying by a capitalization rate selected according to unique features of the property, the appraisal concluded that the property should be valued at $16,800,000 by the Income Approach.

The appraisal noted that it would not estimate value with the Cost Approach to Value because this method was made inaccurate by the age of the building and rent control laws.

Finally, the appraisal gave its final opinion of value as being the higher figure arrived at through the Market Approach, in recognition of the fact "that potential purchasers are motivated more by tax benefits

and conversion potential than cash flow" (p. 43). The appraisers stated that while the "property does have some investment appeal, the most likely purchaser would be a tax structured limited partnership." The appraisal concluded that the fair market value of the property was $20,400,000.

The property was, in fact, purchased by the East 56th Street partnership from an intermediate purchaser for an aggregate purchase price of $20,100,000. This price is $300,000 less than the appraised value estimated by James H. Burns Co.

We return to the allegations in the complaint that the memoranda represent that the "fair market value" of the property exceeded the principal of the wraparound mortgage note (*Stern* pars. 38(j) and 44(dd)). Such representations, however, are not made in the private placement memoranda. In addition, substantial disclaimers were made in the memoranda, noted above, concerning the ability of the partnership to meet its debt obligations.

■ Next we turn to the allegations that the purchase prices paid by the partnerships exceeded fair market value, because the true value of the property was that paid by the first intermediate purchaser. *Stern* pars. 38(k), 44(m), and 44(cc). Plaintiffs have submitted no facts, nor alleged any circumstances, to support these conclusory allegations. Indeed, the very figures cited to show defendants' fraudulent intent were those displayed to prospective investors in the private placement memoranda. Plaintiffs cannot now use these figures as indicative of fraud. A recent statement by a court in this district about a similar complaint applies equally well here:

> [U]pon reviewing the Memoranda as a whole, the presentation of [the] appraisals and opinions do not suggest intentional fraud or reckless conduct. The Memoranda disclose the stepped-up price transactions in substantial detail, state that they were not arms-length transactions, and that the Internal Revenue Service may well consider the values as being overstated. "In short, plaintiffs' 'own source repels [their] claims.' "

*O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 283 (S.D.N.Y.1990) (citation omitted).

■ The vague allegation that the memoranda omitted to disclose that "often" no appraisal was available to investors despite representations to the contrary does not amount to a claim of fraud of any substance.

■ No material omission has been sufficiently pled in the allegations that the private placement memoranda failed to make disclosures about the method used in appraising the properties. *Stern* par. 45. The memoranda do not purport to contain every morsel of information a prospective investor would require. Further, defendants were under no obligation to use any particular appraisal approach, nor to mention the appraisals in the private placement memoranda. The appraisals themselves contain substantial descriptions of the methods chosen.

■ Finally, we turn to the allegations in a few of the complaints that "the appraisal was not from an independent appraiser." *Roman* par. 24(k). Although a complaint need aver intent only generally under Rule 9(b), the complaint must allege facts which give rise to a strong inference that defendants possessed the requisite fraudulent intent. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). As with all of plaintiffs' conclusory allegations, no such facts have been pled. As stated above, the complaints suggest that the circumstances from which fraudulent intent may be inferred are the fact that most of the partnerships paid substantially higher prices than those paid by defendants' affiliates only a short time previously. These are the very facts, however, which were fully disclosed to investors prior to their investment.

In viewing the complaints as a whole, there seems to be no genuine issue of fact about the appraisals. More is needed to allege fraud than hindsight. Defendants are entitled to summary judgment dismissing the allegations regarding the fair mar-

ket value of the property and the appraisals.

Allegations Unique to Certain Complaints

There are a few allegations that are unique to certain complaints. These will be treated individually below.

a. *Stern*

██ In the *Stern* complaint, plaintiffs allege (par. 37(a)) that the East 56th Street Memorandum represented to investors that the general partners anticipate that, prior to the closing date under the Agreement, Rodeo will assign its rights under the contract to the Partnership for an aggregate purchase price of $20,100,000 consisting of $7,500,000 cash and a purchase note in the principal amount of $12,600,000 secured by a wraparound mortgage (see by way of illustration, p. 9 of the Memorandum).

The complaint alleges (par. 38(a)) that this representation was false because the "partnership intended to purchase the property for only $4,500,000 cash and a wraparound mortgage in the amount of $15,600,-000."

If there is this discrepancy, it presents a *de minimus* issue in light of the overall picture.

b. *Riccio*

██ The *Riccio* complaint concerns a partnership called Bristol Associates. An affiliate of D.B.G., 850 Management, acted as the intermediary, buying the property from an outside seller, Landview Associates. There is no allegation that Landview Associates was in any way connected with defendants. 850 Management, in turn, sold the property to the partnership at a stepped-up price.

The *Riccio* complaint alleges (par. 17) that the terms of the agreement between the owner and 850 Management were not disclosed in the Bristol Associate memorandum.

The complaint also alleges, however, that the memorandum represented that the partnership was to purchase the property from 850 Management for $4,380,000, of which $416,880 would be paid in cash and $3,963,120 would be paid by a note secured by a wraparound mortgage. The complaint adds that the memorandum disclosed that 850 Management was to receive a profit on the sale in excess of $730,000, "the difference between the wraparound mortgage and the mortgage payable by 850 Management" to the seller. In addition, the complaint alleges that the memorandum disclosed that "850 Management was to receive as profit the difference between the interest rate between the wraparound mortgage and the aggregate interest paid on the underlying mortgages." *Riccio* par. 18.

Upon examining the Bristol Associates memorandum, it becomes apparent that the allegation does not sufficiently state a claim for fraud. The terms of the agreement between 850 Management and Landview Associates are readily ascertainable from the disclosed material.

First, in a description of the "Property Financing", the Bristol Associates memorandum discloses that 850 Management purchased the property from Landview Associates for a purchase money wraparound mortgage of $3,233,120, to be executed at closing (p. 33–34).

Second, in the section on "Use of Proceeds Including Compensation and Fees to the General Partner, Its Affiliates and Others," the memorandum discloses that the partnership was to make a cash payment directly to Landview Associates, in the amount of $416,880 (p. 26).

Finally, as described in the complaint itself, the private placement memorandum discloses that the only profit 850 Management was to receive from the resale of the property to the partnership was the disclosed differences in the amount of the wraparound mortgages and interest thereon.

Thus, it is apparent that the terms of the agreement between Landview Associates and 850 Management were the disclosed amount of wraparound mortgage, plus the cash payment of $416,880 to be paid by the partnership directly to Landview at closing.

The memorandum discloses the information allegedly withheld. The *Riccio* complaint does not allege that the disclosed figures were inaccurate. No omission exists. Defendants in the *Riccio* complaint are entitled to summary judgment on the allegation that they failed to disclose the terms of the agreement between the seller and the DBG affiliate.

c. *Roman*

■ The *Roman* complaint alleges (par. 23(1)), that the private placement memorandum in the Briargate Associates partnership represented that a corporate defendant, Warren Murray Property Management,

> was to serve as supervisory agent in monitoring the overall partnership operations, in reviewing the income and expenses of the partnership and the terms of the contemplated conversion of the property to condominium status, and in assisting in the refinancing of the wraparound mortgage and liquidating of the partnership. (*See* pages 72–73 of the Memorandum).

The complaint alleges (par. 24(1)) that this was a misrepresentation because

> Warren Murray was not to perform any services of any value for the partnership. Warren Murray was only to serve as a vehicle for depleting the partnership of its assets.

Again, the complaint has made only a bare, conclusory allegation. No fact has been pled which warrants trial on the issue of the services performed by Warren Murray.

State Law Claims

■ As defendants are entitled to summary judgment on all of the federal claims, the state law claims of common law fraud and breach of fiduciary duty are dismissed for lack of jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

Sanctions

■ The court is confronted with 27 equally frivolous complaints filed by the same law firm, Beigel & Sandler. Although alleging misrepresentations and material omissions from over 30 private placement memoranda, the complaints contain no more than one or two direct quotations from, or page citations to, these voluminous documents. It appears to the court as if the complaints were spun out of a word-processed original, with little attention to the details of each partnership and its private placement memorandum.

Each complaint is as groundless as the next. Each ignores the substantial disclosure in the private placement memoranda. Indeed, it seems impossible that the drafters of these complaints could have read the memoranda. If they had read the memoranda, they would have discovered that their allegations were entirely frivolous. No set of facts has been pleaded which gives rise to any inference that fraud has been committed.

The signature of an attorney upon a complaint constitutes a certificate that he or she has read the pleading and that "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact." Fed. R.Civ.P. 11. Not one of these complaints appears to be grounded in fact as pled.

Although defendants have applied for sanctions, they have not accompanied this application with a request for a specific amount or with information about lawyers' time spent or other similar matters.

Under the circumstances, the court believes that an amount of sanctions should be awarded which will compensate defendants to some extent for their efforts in defending this action, and will also serve as a warning to Beigel & Sandler against further misconduct.

The court awards sanctions in the amount of $25,000. Payment is to be made to the law firm of Baer, Marks & Upham and the amount is to be distributed among defendants by agreement.

## CONCLUSION

In conclusion, defendants' joint motion for summary judgment is granted. All of

the DBG complaints are dismissed. Sanctions are awarded in the amount of $25,000.

Settle judgment.

SO ORDERED.