Dr. Robert SABLE, et al., Plaintiffs,

v.

SOUTHMARK/ENVICON CAPITAL CORP., et al., Defendants.

No. 90 Civ. 8047 (MBM).

United States District Court, S.D. New York.

April 26, 1993.

Joseph J. Tabacco, Jr., Earle Giovanniello, Stamell, Tabacco & Schager, New York City, for plaintiff.

Andrew J. Gershon, Eric Bregman, Sive Paget & Riesel, New York City, for defendants Southmark/Envicon Capital Corp., Equity Associates, Ltd. and Southmark Partners One, Ltd.

Andrew J. Levander, Shereff, Friedman, Hoffman & Goodman, New York City, Leighton Aiken, Dana M. Campbell, Owens, Clary & Aiken, L.L.P., Dallas, TX, for defendants Vista Associates, Ltd., Michael S. McGee and Eugene W. Rosen.

Edward Brodsky, Howard N. Spiegler, Proskauer Rose Goetz & Mendelsohn, New York City, for defendants Gene E. Phillips, William S. Friedman and William S. Friedman, P.C.

Sharon A. McCloskey, D'Amato & Lynch, New York City, for defendant Trotter Smith & Jacobs, P.C.

George B. Schwab, Mayer, Brown & Platt, New York City, Robert J. Kriss, Mayer, Brown & Platt, Chicago, IL, for defendant Grant Thornton.

Jeffrey R. Mann, Rubin, Baum, Levin, Constant & Friedman, New York City.

W. Kelly Stewart, Gardere & Wynne, Dallas, TX, for defendants Rosedale/Palm Associates, Ltd., San–Da–Mor Associates, Ltd., Merchandise Mart Associates, Ltd. and Towne Parc Associates, Ltd.

Edward Rubin, New York City, for defendant Lawrence Bernstein.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs Robert Sable, *et al.* sue defendants Southmark/Envicon Capital Corp., *et al.* under RICO and state law. Plaintiffs allege that defendants fraudulently induced them to invest in nine limited partnerships in the mid–1980s through misrepresentations and omissions in the private placement memoranda (the "PPMs") for the partnerships.

In 1990 plaintiffs filed their first complaint in this case. In 1991 plaintiffs filed an amended complaint. On June 4, 1992—after an April 7, 1992 conference at which I allowed plaintiffs to amend again but cautioned plaintiffs that disclosures in the PPMs flatly contradicted many of the non-disclosure allegations in the amended pleading—plaintiffs filed their third complaint: the Second Amended Class Action and Verified Derivative Complaint, a relatively svelte 29–page highlight of the more than 500 pages of allegations that had not survived until then. Defendants move to dismiss plaintiff's complaint for failure to state a claim upon which relief may be granted, pursuant to Fed. R.Civ.P. 12(b)(6), and for failure to plead fraud with particularity, pursuant to Fed. R.Civ.P. 9(b). Also, defendants move for sanctions. For the reasons stated below, defendants' motions are granted.

### I.

Beginning in the 1970s, Southmark Corporation and its affiliates sponsored, syndicated, and managed hundreds of real estate limited partnerships, including the nine limited partnerships at issue here. (Compl. ¶¶ 20, 22–23) [1] Defendants all functioned under the umbrella of Southmark Corporation, which filed for protection under the Federal Bankruptcy laws on July 14, 1989. (Compl. ¶ 22)

The limited partnerships offered plaintiffs income tax and other benefits. Between 1983 and 1986, plaintiffs as a class invested more than $50 million in the partnerships, as follows:

| Partnership | Date of Offering State of Partnership | Size of Offering | Property Type |
|---|---|---|---|
| Club Assoc. Ltd. ("Club") | July 1, 1983 Texas | 5.7 million | Apartment Complex |
| Rosedale/Palms Assoc. Ltd. ("Rosedale/Palms") | September 1, 1983 South Carolina | 5.25 million | Office Building Apartment Complex |
| San–Da–Mor Assoc. Ltd. ("San–Da–Mor") | November 25, 1983 Texas | 8.4 million | Office Building Apartment Complex |
| Williamsburg Assoc. Ltd. ("Williamsburg") | October 1, 1984 Virginia | 6.1 million | Resort Hotel |
| Sanlando Assoc. Ltd. ("Sanlando") | June 15, 1985 Florida | 4.5 million | Office Building |
| Merchandise Mart Assoc. Ltd. ("Merchandise Mart") | September 1, 1985 Colorado | 7.65 million | Merchandise/Mart and Hotel |
| Towne Parc Assoc., Ltd. ("Towne Parc") | September 15, 1985 Texas | 2.35 million | Apartment Complex |
| Honolulu Storage, Ltd. ("Honolulu") | October 15, 1985 Hawaii | 6.1 million | Personal Storage Warehouse Facility |
| Vista Assoc. Ltd. ("Vista") | June 1, 1986 Texas | 5.75 million | Health Care Facility |

(Compl. ¶¶ 23, 28)

Plaintiffs' claims, brought on their behalf, on behalf of class members, and derivatively, are for violations of RICO, 18 U.S.C. §§ 1962(a), (c), (d), and various pendent state claims for common law fraud, breach of fiduciary duty, waste, and mismanagement, under the laws of Texas, South Carolina, Virginia, Florida, Colorado, and Hawaii. (Compl.

---

**1.** "Compl." refers to plaintiffs' Second Amended Class Action and Verified Derivative Complaint, dated May 29, 1992 and filed June 4, 1992.

¶¶ 89–93) Plaintiffs claim that defendants, through the PPMs,[2] fraudulently induced plaintiffs to invest in the nine partnerships listed above. (Compl. ¶¶ 22–25)

Defendants move to dismiss plaintiffs' claims for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), and for failure to plead fraud with particularity, pursuant to Fed. R.Civ.P. 9(b). Defendants Southmark/Envicon Capital Corp., Equity Associates, Ltd., Gene E. Phillips, William S. Friedman, John W. Galston, Eugene W. Rosen, Michael S. McGee, and William S. Friedman, P.C. (the "Moving Defendants") have joined in one motion to dismiss. Each of defendants Grant Thornton, Trotter Smith & Jacobs, and Lawrence Bernstein (the "Professional Defendants") has brought a separate motion to dismiss. One of the limited partnerships—Vista Associates, Ltd.—brought a separate motion to dismiss, as well as a motion for summary judgment. The other limited partnerships joined in another motion to dismiss.

"The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Festa v. Local 3 Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir.1990). Thus, a motion to dismiss must be denied "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988).

In deciding a motion to dismiss, the court must accept the plaintiff's allegations of fact as true, together with such reasonable inferences as may be drawn in his favor. *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986). Nevertheless, the complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. *Telectronics Proprietary, Ltd. v. Medtronic,*

*Inc.,* 687 F.Supp. 832, 836 (S.D.N.Y.1988). "The District Court has no obligation to create, unaided by plaintiff, new legal theories to support a complaint." *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1081–82 (D.C.Cir.1984).

■ In addition, in deciding a motion to dismiss, a court in the Second Circuit may consider documents which form the basis of allegations of fraud if the documents are "integral to the complaint." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (affirming dismissal of complaint where prospectus was considered); *see also Kramer v. Time Warner Inc.,* 937 F.2d 767 (2d Cir.1991); *Adler v. Berg Harmon Assocs.,* 816 F.Supp. 919, 922 n. 3 (S.D.N.Y. March 29, 1993); *Ferber v. Travelers Corp.,* 785 F.Supp. 1101, 1103–04 n. 6 (D.Conn.1991); *United States v. District Council,* 778 F.Supp. 738, 749 n. 3 (S.D.N.Y. 1991). The parties have submitted the PPMs, each with an appended tax opinion prepared by Trotter, Smith & Jacobs ("Trotter"). (*See, e.g.,* Burns Aff. Ex. B at A00375) Those documents are integral to plaintiffs' fraud claims—especially those claims relating to the "true market value" of certain partnership properties. (Compl. ¶ 25) Accordingly, I have considered the PPMs and the Trotter tax opinions in deciding these motions.

■ Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986). Rule 9(b) extends to RICO claims that, like plaintiffs' claims, are based wholly upon alleged predicate acts of securities and mail fraud. *See, e.g., O'Brien v. Nat'l Property Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y. 1989) (citing cases). Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of a defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits. *Di Vittorio v. Equidyne Ex-*

---

**2.** Copies of the nine PPMs at issue were attached as Exhibits "A" through "I" to the Affidavit of

Lori Burns filed April 30, 1991 submitted in support of defendants' initial motion to dismiss.

*tractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). The Second Circuit has held that

> reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of representation where ... defendants are insiders or affiliates participating in the offering of securities.

*O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y.1990) (citing *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990)). The extent to which the PPMs and the tax opinions satisfy Rule 9(b) is discussed below.

## II.

The limited partnerships at issue here were typical of the genre known as "tax shelters." The partnerships were structured to generate federal income tax deductions for investors from losses on the sale and lease of certain property. The "Economic Benefits" section of each PPM indicated that:

> The economic benefits from the Partnership, which should be analyzed by each prospective Investor with respect to his personal financial objectives, include his share of the following: (i) the *potential* capital appreciation to be realized upon distribution of the net proceeds, if any, from a sale or refinancing of the Project, (ii) the *potential* cash distributions with respect to the Project, and (iii) *federal income tax deductions.*

(Club PPM at 28; Rosedale/Palms PPM at 29; San–Da–Mor PPM at 37; Williamsburg PPM at 33; Sanlando PPM at 32; Merchandise Mart PPM at 34; Towne Parc PPM at 31; Honolulu PPM at 31; Vista PPM at 32) (emphasis added) Each PPM described at length the "Federal Tax Aspects" of the partnerships, including that 99% of any taxable losses to the partnerships would be allocated to the limited partners. (*See, e.g.,* Club PPM at 31) In other words, the PPMs represented that investors in the partnerships could expect economic benefits from tax deductions with near certainty, but that they could expect only a chance of capital appreciation or cash.

Plaintiffs received tax benefits from the partnerships as they expected and, not surprisingly, have not featured those tax benefits in their pleadings or motion papers. However, in their most recent memorandum, plaintiffs concede that "prior to the Tax Reform Act of 1986, investment in real estate limited partnerships offered the potential of deferring taxes through depreciation and credits." (Pl. Mem. at 17) Moreover, now plaintiffs admit that most of the investors in this case "were attracted to the alleged tax advantages offered by the Southmark sponsored partnerships" at issue here. (*Id.*)

For each partnership, defendants obtained an opinion letter from its tax counsel, Trotter, representing that investors could deduct losses from the partnerships in calculating their income tax liability. (Compl. ¶ 59) Each tax opinion in the offerings for the nine partnerships contained the following statement by Trotter:

> The following matters have been represented to us by Southmark [or its affiliates connected to the transaction] or the Sponsor [Southmark/Envicon] to our satisfaction as being true and correct: ... (iv) the fair market value of the Project approximates the amount of the Purchase Note ...; (v) it is anticipated that the Project will continue to generate income that, together with the capital contributions of the Limited Partners, will provide adequate funds for operation of the Project and the payment of the interest on the Purchase Note; (vi) the interest payable on the Purchase Note, including any additional interest, represents a fair market rate of interest in light of all the facts and circumstances; (vii) the basic rent payable under the ground lease represents a fair market rent for the leased property...."

(Compl. ¶ 61) Thus, Trotter represented that certain matters were true for the purpose of assessing for investors the tax consequences of the partnerships.

These nine partnerships were risky investments—like most limited partnership investments in tax shelters—and the PPMs for the partnerships bristled with warnings about risk. Each PPM warned investors repeatedly about "SUBSTANTIAL RISKS": operational risks, income tax risks, and risks relating to uninsured losses, mortgages and indebtedness, conflicts of interest, and use of

proceeds to pay purchase price and fees. (Club PPM at ii, 3; Rosedale/Palms PPM at ii, 3; San–Da–Mor PPM at ii, 3; Williamsburg PPM at ii, 3; Sanlando PPM at ii, 3; Merchandise Mart PPM at ii, 4; Towne Parc PPM at ii, 3; Honolulu PPM at ii, 3; Vista PPM at ii, 3)

In fact, the first major heading of each PPM was *"RISK FACTORS,"* and each PPM warned that "an investment in the Units offered hereby involves significant risks and is suitable only for persons of substantial means *who have no need for liquidity in their* investments." *(See, e.g.,* Club PPM at 3) Each PPM devoted several pages to explaining certain risks and potential conflicts of interest, including the "compensation of sponsor and others," and other risks arising from the "acquisition and financing of the project." *(See, e.g.,* Club PPM at 18, 41) The PPMs described fully each and every interest charge, fee, and other payment to the partnership sponsor and its affiliates in connection with each partnership's acquisition of its real estate. *(See, e.g.,* Club PPM at 18 *et seq.)* The PPMs stated candidly that investors would not receive positive cash flows for several years, if ever. *(See, e.g.,* Club PPM at 28–29)

The PPMs contained financial projections related to the partnerships, as described below. However, the PPMs cautioned that those "projections are provided solely for the purpose of illustration [and] INVESTORS ARE URGED, THEREFORE, TO CONSULT THEIR OWN ADVISORS ... WITH RESPECT TO SUCH ASSUMPTIONS, HYPOTHESES AND PROJECTIONS." *(See, e.g.,* Club PPM at 28)

### III.

In the face of these warnings, plaintiffs allege that defendants offered partnership interests to plaintiffs "based on materially false or misleading disclosure documents and inflated assumptions," (Compl. ¶ 28) and that defendants overstated "the values of the properties held by the partnerships." (Compl. ¶¶ 29–51; Pl. Mem. at 4)

Plaintiffs allege a far-reaching racketeering scheme predicated upon mail and securities fraud. Primarily, plaintiffs allege that defendants distributed misleading prospectuses with the intent "to portray falsely and overstate the value of the securities sold to the plaintiffs...." (Compl. ¶ 75)

Plaintiffs' central allegation, which this Court must accept as true, is that defendants engaged in the following "step-up" scheme with respect to each partnership: defendants acquired fee title to property in an armslength transaction and soon after, at a higher price, sold and leased to the partnerships certain buildings or "improvements" on the property. (Compl. ¶¶ 24–25) Plaintiffs allege that defendants thereby recorded large "paper" profits from the artificially inflated and misrepresented prices. (Compl. ¶¶ 25, 27) Plaintiffs allege further that defendants concealed the partnerships' severe liquidity problems by advancing "guaranteed return" payments to the partnerships to cover partnership obligations, and that the true source of these payments was a pyramid scheme of continuous debt, stock, and limited partnership offerings based on defendants' inflated "paper" profits. (Compl. ¶¶ 26–27, 52)

What plaintiffs do not mention is that the PPMs disclosed to investors (1) that certain defendants would profit from the syndication, (2) the amount of such profit, and (3) the prices paid in the property sales. For example, the Club PPM disclosed that the sales price paid to Southmark for the Club property on July 1, 1983 was "$11,800,000 [and] Southmark acquired the [property] for $10,250,000 on June 15, 1983 [and that c]onsequently, the sale to the Partnership represents a profit of $1,550,000 to Southmark above Southmark's acquisition cost." (Club PPM at 18)

The Rosedale/Palms PPM disclosed that the sales price paid to Southmark for the Rosedale property on September 1, 1983 was "$4,550,000 [although the property was recorded] at $2,771,473 on March 31, 1983 [and that b]ased on the historical carrying cost, [defendants] will realize a substantial profit on this sale." (Rosedale/Palms PPM at 19) The Rosedale/Palms PPM disclosed further that the sales price paid to Southmark for the Palms property on September 1, 1983 was "$7,020,000 [and] Southmark acquired

Palms together with 3 other Carolina apartment projects for a total price of $23,536,288 on May 1, 1983 [and] Southmark has allocated $5,884,072 of the total purchase price to Palms [and that c]onsequently, the purchase represents a substantial profit to Southmark above Southmark's acquisition cost." (Rosedale/Palms PPM at 19–20)

The other seven PPMs disclosed similar details about sales prices of and profits from the transactions involving partnership property, and about the prices of the improvements for which plaintiffs claim they paid an excessive price in the form of a promissory note with an excessive rate of interest. (San–Da–Mor PPM at 22–23; Williamsburg PPM at 21; Sanlando PPM at 22; Merchandise Mart PPM at 23; Towne Parc PPM at 21; Honolulu PPM at 21–22; Vista PPM at 22).

As noted above, in the tax opinion for each of the nine partnerships at issue, defendant Trotter stated that certain representations about values, revenues, and rents of properties held by the partnerships had "been represented to us ... to our satisfaction as being true and correct." (Compl. ¶ 61) The tax opinions were appended to and incorporated in each of the PPMs, and prospective investors were directed to review the tax opinions. (Compl. ¶ 61)

Plaintiffs allege that these tax opinions were "materially false and misleading," (*id.*) and that Trotter "knew or had reason to know that the representation[s] were false and misleading." (Compl. ¶ 63) Plaintiffs allege that Trotter, as Southmark's general and corporate counsel, had access to non-public details of the acquisitions of various properties by Southmark-controlled entities for resale to each partnership. (Compl. ¶ 60)

Plaintiffs argue that the "linchpin" of their decision to invest in the partnerships was "tax counsel's opinion that the underlying mortgage on the property did not exceed its economic value." (Pl. Mem. at 17–18) Plaintiffs allege that defendants misrepresented Southmark's asset value and shareholder equity because defendants' representations were based, in part, on mortgages on properties that grossly exceed the value of the underlying properties. (Pl. Mem. at 5)

With respect to the predicate offense of securities fraud, plaintiffs allege that defendants directly violated Rule 10b–5 by misrepresenting and/or omitting:

(i) ... in the tax opinions of defendant Trotter appended to each PPM that the amount of the notes encumbered [*sic*] each partnership property approximated the fair market value of each property;

(ii) the total profit made by affiliates of the general partner on the sale of the Improvements and lease of the Land to the Partnerships; and

(iii) financial forecasts contained in each PPM, which systematically understated the size and duration of the losses each of the Partnerships would generate and which were based on unrealistic assumptions which were known to be false when made because they were based on purchase prices which were materially in excess of the fair market value of the properties.

(Compl. ¶ 74) These allegations, in greater detail, are as follows:

First, plaintiffs allege that defendants misrepresented the value of plaintiffs' investment in the partnerships. Plaintiffs allege that defendants

made unwarranted profits on the resale, and then collected exorbitant lease payments for the underlying land. The profits ... were not disclosed, were disclosed in a misleading fashion, or were not disclosed in a manner required by federal and state securities laws. Utilizing deficient appraisal methods or no appraisals at all, the prices of the property were artificially inflated above the true market value upon resale to the Partnerships, a critical fact uniformly misrepresented in tax opinions appended to each of the Private Placement Memoranda ("PPMs") of the nine Partnerships.

(Compl. ¶ 25)

Second, plaintiffs allege that defendants failed to disclose that defendants Lawrence Bernstein and Grant Thorton were not independent. Lawrence Bernstein was a certified public accountant in New York City who

compiled financial forecasts for six of the partnerships, and Grant Thorton was a certified public accounting firm that compiled forecasts for the other three partnerships. Plaintiffs allege that defendants did not disclose that certain Southmark-controlled entities were "very substantial clients to both Bernstein and Grant." (Compl. ¶ 57) Grant Thorton acted as Southmark's public auditors and certified Southmark's financial statements without qualification for each of the years 1983 through 1988. (Compl. ¶ 14) Southmark/Envicon engaged Lawrence Bernstein to compile financial forecasts for six of the partnerships. (Compl. ¶ 13)

Plaintiffs allege that defendants Grant and Bernstein were obligated to follow certain standards of care as certified public accountants. (Compl. ¶ 55) Plaintiffs allege that

> [b]oth Berstein & Grant as part of knowing participation in the racketeering scheme, intentionally or recklessly disregarded information showing that the assumptions in which [certain forecasts] were based were not reliable or realistic and were grossly inflated and overstated because they were based on purchase prices which were above fair market value.

(Compl. ¶ 56)

Plaintiffs allege that defendants Trotter and Friedman, P.C. participated in the fraudulent scheme "[b]y stating that it was satisfied with the truth and accuracy of these representations and failing to exercise professional due diligence." (Compl. ¶ 63) Plaintiffs allege that Trotter, by stating that it was satisfied with the truth and accuracy of other defendants' representations, implied that the amount of debt placed on each partnership property—usually 95–98% of the purchase price—represented the fair market value of the property. (Compl. ¶ 62) Plaintiffs allege that

> Trotter, as Southmark general counsel and author of the nine tax opinion letters appended to the PPMs and Friedman, P.C., the law firm of defendant Friedman identified in the PPMs as 'Counsel to the Partnership, General Partner and Sponsor,' were intimately involved or familiar with

the financial aspects of each of the offering, and thus are charged with knowledge and the requisite intent to join in the scheme and plan to defraud plaintiffs....

(Compl. ¶ 64)

Third, plaintiffs allege that the PPMs and certain sales brochures "prominently displayed financial forecasts ... that misstated the likely amount of losses that the partnerships would generate." (Pl. Mem. at 6; Compl. ¶¶ 56–58) Plaintiffs allege that certain defendants distributed "Reports to the Limited Partners" that made "bullishly optimistic statements about the future prospects for the various properties" at issue. (Compl. ¶ 67) *See, e.g.,* 5/23/86 Rosedale/Palm Rept. ("Although much of South Carolina is experiencing a market downturn, occupancy rates ... have been consistently higher than the area average.... We are confident that this leasing trend will continue."); 4/27/89 Williamsburg Rept. ("[C]oncessions ... will allow us to embark on a more profitable capital improvement program [and] a brighter and more profitable future."); 5/17/89 Vista Rept. ("Vista's fine reputation has enabled it to continue to perform exceptionally well...."); 5/4/89 Honolulu Rept. ("Occupancy Makes a Steep Jump ... improved performance...."); 8/19/89 Towne Parc Rept. ("... continued good performance of Towne Parc ..."). (Compl. ¶ 67)

Finally, plaintiffs allege that they could not have known of the material omissions, and that each reasonably relied to his detriment on the PPMs and the tax opinions in purchasing limited partnership interests. (Compl. ¶¶ 65–66) Plaintiffs allege that the PPMs were "[v]ery substantial"[3] and were accompanied by "slick sales brochures called 'fact sheets' [that] purported to describe both the risks of the investments and the potential rewards." (Compl. ¶ 52) Plaintiffs assert that although these financial forecasts were presented as hypothetical, "the analysis expressly or impliedly represented that the financial results were anticipated to be realistic." (Compl. ¶ 54)

---

**3.** Ironically, the PPMs—each less than 100 pages—were dwarfed by plaintiffs' original and first amended complaints—232 and 274 pages, respectively.

IV.

To state a RICO claim, plaintiffs must state among other things a claim based on one of the predicate acts specified by 18 U.S.C. § 1961(1). Plaintiffs' RICO claim is based on predicate acts of violation of (1) Section 10(b) and Rule 10b–5, the antifraud provisions of the Securities Exchange Act, 15 U.S.C. §§ 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1992), and (2) the mail fraud statute, 18 U.S.C. § 1341. (Compl. ¶ 69) Those predicate violations, in turn, are based on three types of material misstatements or omissions in the PPMs: (1) overstating the value of properties held by the partnerships and profits related to those properties; (Compl. ¶¶ 25, 29–51, 60–65) (2) failing to disclose certain conflicts of interest; (Compl. ¶¶ 13–14, 38, 48–49, 57) and (3) forecasting returns based on information defendants knew was false. (Compl. ¶¶ 52–58)

For the reasons stated below, plaintiff has not stated a claim with respect to these alleged misstatements or omissions for either securities or mail fraud. Because the RICO claim "contains no valid allegations of 'fraud' to underpin the 'predicate acts' of racketeering, it necessarily must fail." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 18–19 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

### A.

To state a claim for fraud under Section 10(b) plaintiffs must allege (1) material misstatements or omissions, (2) indicating an intent to deceive or defraud, (3) in connection with the sale or purchase of a security, (4) upon which the plaintiffs reasonably relied to their detriment. *See Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986); *Brown v. E.F. Hutton Group*, 735 F.Supp. 1196 (S.D.N.Y. 1990). Plaintiff has not pleaded these elements.[4]

---

4. With respect to the third element, the description of predicate acts under RICO, 18 U.S.C. § 1961, does not limit securities fraud to "fraud in connection with the purchase and sale of securities." Recently, the Supreme Court, in *Holmes v. Sec. Investor Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), noting the broad remedial purpose of RICO, refused to rule out RICO securities fraud claims by

1.

*Material misstatements or omissions*

Plaintiffs have not alleged material misrepresentations or omissions sufficient to state a claim for securities fraud because (1) plaintiffs' claims are premised on facts disclosed in the PPMs, (2) the alleged misrepresentations and omissions were not material to plaintiffs' decision to invest in the partnerships, and (3) the PPMs "bespeak caution" about statements upon which plaintiffs alleged relied.

 First, plaintiffs cannot state a claim of misrepresentation premised upon facts that were admittedly disclosed. *See O'Brien v. Price Waterhouse*, 740 F.Supp. 276, 283 (S.D.N.Y.1990), *aff'd*, 936 F.2d 674 (2d Cir. 1991). "The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud." *Decker v. Massey–Ferguson, Ltd.*, 534 F.Supp. 873, 880 (S.D.N.Y.1981) (quoting *Spiegler v. Wills*, 60 F.R.D. 681 at 683 (S.D.N.Y.1973)), *aff'd in relevant part*, 681 F.2d 111 (2d Cir.1982).

Plaintiffs attempt to allege that the PPMs misrepresented the price at which defendants acquired partnership property, but they now concede that those prices were disclosed fully in the PPMs. (Pl. Mem. at 23) ("... despite the disclosed massive inflation in the prices paid for the property ..."). At the April 7, 1992 conference, plaintiffs claimed that their allegations related to information other than that disclosed in the PPMs. However, as described above, the PPMs disclosed in detail the profits and prices from property sales. Plaintiffs cannot ignore this disclosure now.

In addition, plaintiffs complain that "Trotter knew or recklessly disregarded the *fact*

non-purchasers or non-sellers. Nevertheless, whether those plaintiffs who were already investors in earlier limited partnerships at the time of the alleged fraud—and consequently were neither purchasers nor sellers—can demonstrate subsequent RICO injury is irrelevant, because the Second Amended Complaint as a whole fails to allege the other elements.

that Southmark or its affiliates usually purchased land and improvements just weeks or months before the offering in arm's length transactions ... that were much more likely to reflect a fair market value than the sale of the improvements alone by Southmark to each of the Partnerships." (Compl. ¶ 60) (emphasis added) Again, this "fact" was fully disclosed in each of the PPMs.

■ Plaintiffs cannot base their claims on an inference drawn from disclosure in one document—the Trotter tax opinion—if that inference contradicts more specific disclosure in another document—the PPM. A reasonable investor will not be deceived by nondisclosure of inferences if he or she can draw whatever inferences might be appropriate based on disclosed facts. *Cf. Klamberg v. Roth*, 473 F.Supp. 544, 551–52 (S.D.N.Y.1979) (citing cases) ("As a general rule, so long as material facts are disclosed or already known, it is not deceptive to fail to ... verbalize all adverse inferences expressly.") In other words, plaintiffs cannot state a claim simply because the tax opinions failed to declare expressly that investors should not draw adverse inferences about property values from the tax opinions, if such inferences contradict explicit disclosure about values in the PPMs. "[T]here is no duty to disclose information to one who reasonably should be aware of it." *Klamberg v. Roth*, 473 F.Supp. at 552 (citing cases).

■ Second, plaintiffs cannot state a claim based on alleged misrepresentations and omissions that were not material to plaintiffs' decision to invest in the partnerships. Even if the PPMs did not disclose adequately that Southmark and its affiliates were profiting from the syndications of the partnerships, such omissions were not material to the plaintiffs' decision to invest. *See, e.g., Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Consolidated Gold Fields, PLC v. Anglo American Corp.*, 713 F.Supp. 1457, 1470 (S.D.N.Y.), *aff'd in part and rev'd in part*, 871 F.2d 252 (2d Cir.), *cert. dismissed*, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989).

■ In *Basic, Inc. v. Levinson*, the Supreme Court adopted the definition of materiality set forth in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), for actions arising under federal securities laws. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–50, 108 S.Ct. 978, 983–93, 99 L.Ed.2d 194 (1988). Under this definition, an omitted fact is material "if there is a substantial likelihood that a reasonable [investor] will consider it important in deciding how to [invest]." *Id.* at 231, 108 S.Ct. at 983. To fulfill this materiality requirement, there must be substantial likelihood that disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly "altered the total mix" of information made available. *Id.; Brown v. E.F. Hutton Group*, 735 F.Supp. at 1201. The determination requires an assessment of the inferences a reasonable investor would draw from a given set of facts and the significance of those inferences to him. *Basic, Inc. v. Levinson*, 485 U.S. at 240–41, 108 S.Ct. at 988.

Applying this standard, this Court held recently:

Although a company is not required to engage in "educated guess or predictions," it must disclose "basic facts so that outsiders may draw upon their own evaluative expertise in reaching their own investment decisions." ... A company is not required to speculate about future events which are unlikely to occur or which the company is convinced will not occur. Such speculation could easily mislead and confuse shareholders. Furthermore, "corporations are not required to address their stockholders as if they were children in kindergarten." ... It is thus sufficient if the company provides information as to material facts in a format from which a reasonable investor could reach his own conclusions as to the risks of the transaction.

*Consolidated Gold Fields*, 713 F.Supp. at 1470 (citations omitted).

Plaintiffs do not allege that they believed, when they purchased the partnerships, that the purchase price was indeed at or below fair market value. Plaintiffs do not and cannot allege that the information that they argue was never disclosed to them was material to their investment decisions. The partnerships represented tax-shelter investments

whereby, for the obligation to purchase limited partnership units, an investor would realize benefits in the form of tax-deductible losses. Plaintiffs do not contend that the profits or compensation defendants realized had any bearing on the tax benefits to be realized by the investors, or on any individual's decision to invest in the partnerships. The conceded purpose for which plaintiffs invested was tax losses; that reason undercuts their current claims. Purchase price, interest rates, and profits to affiliates are of little material interest to a party whose goal is to maximize tax losses in exchange for a limited partnership investment. The PPMs provided plaintiffs—sophisticated investors seeking tax deductions—with sufficient "information as to material facts in a format from which a reasonable investor could reach his own conclusions as to the risks of the transaction." *Consolidated Gold Fields,* 713 F.Supp. at 1470.

 Moreover, defendant Trotter cannot be liable for any active misrepresentation concerning the fair market value assessment of the properties. Trotter did not render an independent opinion of value; rather, it merely accepted the representations of defendant-sponsors so that it could render a satisfactory tax opinion. The tax opinion letter was intended to be

> [a]n opinion concerning certain of the potential federal income tax consequences to investors who acquire limited partnership interests in the Partnership....

(Burns Ex. A. at A00128) A similar statement appears in each tax opinion letter.

At the time of their investment, plaintiffs certainly could have drawn a different conclusion from the one they impute to the tax opinion as to the value of the partnership property. Plaintiffs treat the tax opinion as an independent opinion of value. However, plaintiffs have not alleged that the IRS has disallowed deductions or otherwise taken action as a result of the tax opinion. Consequently, to the extent the tax opinion was an independent valuation, it was a good one, at least for tax purposes. Plaintiffs' argument that the tax opinion is an independent opinion of value for non-tax purposes would extend the liability of professionals for state-

ments which were made for a particular purpose, but utilized out of context for a completely different purpose. *See, e.g., Friedman v. Arizona World Nurseries, Ltd. Partnership,* 730 F.Supp. 521, 541 (S.D.N.Y.1990), *aff'd,* 927 F.2d 594 (2d Cir.1991); *Feinman v. Schulman, Berlin & Davis,* 677 F.Supp. 168 (S.D.N.Y.1988).

 Third, plaintiffs cannot state a claim with respect to misrepresentations and omissions about which the PPMs "bespeak caution." *See, e.g., Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986). In general, courts are reluctant to impose Section 10(b) liability based solely upon what turn out to be wrong projections of financial returns when those projections are tempered by warnings of the risks involved. In *Luce v. Edelstein,* the Second Circuit stated that it "was not inclined to impose liability" on the basis of financial statements in offering materials that projected future cash flow and expected tax benefits because warnings in the PPMs "clearly 'bespeak caution.'" 802 F.2d at 56.

 As stated above, the PPMs abound with disclosures, warnings, and disclaimers in connection with financial projections, and estimates of tax benefits and profitability. When an "offering memorandum ... unequivocally warns potential investors of the risks involved with investing in the limited partnerships," Section 10(b) liability will not lie. *Feinman v. Schulman Berlin & Davis,* 677 F.Supp. 168, 170–71 (S.D.N.Y.1988). The "full disclosure" policy of the securities laws is met when the relevant documents fully disclose the risks involved. *See Feinman,* 677 F.Supp. at 170; *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

 There is an exception to the general rule in *Luce v. Edelstein* when plaintiffs allege facts to indicate that defendants knew that projected profits were never intended to be realized. *See, e.g., Kane v. Wichita Oil Income Fund,* ¶ 96,424 [Current CCH Binder] 1991 WL 233266 (S.D.N.Y.1991); *Duke v. Touche Ross & Co.,* 765 F.Supp. 69, 74 (S.D.N.Y.1991); *Matignon Finance, Inc. v. Ameritel Comm. Corp.,* ¶ 94,846 [1990 CCH Transfer Binder] 1989 WL 153282 (S.D.N.Y.

1989). However, these plaintiffs have not alleged that defendants knew the partnerships were fraudulent as a whole or that defendants knew the partnerships would not benefit investors in the manner indicated in the PPMs. The allegation that defendants knew when they offered the partnerships that intended profits and benefits would not be realized is a harsh allegation, and plaintiffs have not pointed to any facts to justify an exception to *Luce v. Edelstein.*

Given the abundant warnings in the PPMs, the "bullish statements" and financial projections plaintiffs allege were misleading (Compl. ¶¶ 56–58, 67) cannot possibly be the basis for liability. In *Kushner v. D.B.G. Property Investors, Inc.,* 793 F.Supp. 1161 (S.D.N.Y.1992), the Court held that investors' allegations of fraud based on false and misleading assumptions used in the preparation of projections failed to state a claim under the federal securities laws or RICO. The PPMs at issue here contain substantially the same degree of detail, qualifications, and warnings about assumptions and forecasts as the PPMs at issue in *Kushner* and *Luce v. Edelstein, supra.*

## 2.

### *Intent to deceive or defraud*

It is well established that for liability to attach under Section 10(b), plaintiffs must plead and prove that defendants acted with fraudulent knowledge. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) ("10(b) was intended to proscribe knowing or intentional misconduct"); *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 961–62 (2d Cir. 1987); *Luce v. Edelstein,* 802 F.2d at 55. Indeed, a showing of fraudulent knowledge is so important in federal securities fraud actions that courts have required a plaintiff to allege facts that support a "strong inference" of knowledge on the part of defendants. *Cosmas v. Hassett,* 886 F.2d 8, 12–13 (2d Cir.1989); *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987). Although Rule 9(b) allows knowledge and state of mind to be averred more generally, the Second Circuit has held that plaintiffs still must provide in their complaint specific facts to support this strong inference of knowledge. *See, e.g., Cosmas v. Hassett,* 886 F.2d at 12–13; *Di Vittorio,* 822 F.2d at 1248; *Connecticut Nat'l Bank,* 808 F.2d at 962.

■ Plaintiffs have not pleaded any facts to support their claim that defendants possessed the requisite fraudulent knowledge. With respect to the Professional Defendants—especially defendant Trotter—plaintiffs have asserted that those defendants knew or had reason to know their representations were false, but plaintiffs' allegations do not meet the specificity requirements of Rule 9(b).

In limited cases, the unique status of particular defendants supports a strong inference that they knew or should have known some fact. *See, e.g., Cosmas v. Hassett,* 886 F.2d at 13 (strong inference that directors of company knew of foreign import restrictions where allegations were that restrictions would eliminate significant source of income for company); *Goldman v. Belden,* 754 F.2d 1059, 1070 (2d Cir.1985) (defendants' public statements and self-portrayals as industry-wide businessmen sufficient factual basis for attributing knowledge that prospects were dim for company's key product). However, "in those cases, unlike here, the fact at issue was reasonably susceptible of being known." *Brown v. E.F. Hutton Group,* 735 F.Supp. 1196, 1204 (S.D.N.Y.1990). The inferential leap from circumstances to knowledge of "fact" is far greater here than in those cases and, indeed, is impossible to make. *Id.,* 735 F.Supp. at 1204.

■ Plaintiffs have not pleaded any "fact" regarding defendants' knowledge of the prospects of success for the partnership. Plaintiffs do not challenge the validity of the tax opinion, nor do they allege that the tax advice contained therein was erroneous or resulted in adverse tax consequences. Rather, plaintiffs allege that

> By stating that it was satisfied with the truth and accuracy of the representations of Southmark/Envicon, the general partners and the individual defendants, Trotter *implied* in each instance that the amount of debt placed on each Partnership property, usually in the range of 95–98% of the

purchase price, represented the fair market value of the property.

... Because of Trotter's relationship to Southmark and its subsidiaries, Trotter knew or had reason to know that the representation as to the fair market value of the properties, and the other representations that it accepted as true and correct, were false and misleading. By stating that it was satisfied with the truth and accuracy of these representations and failing to exercise professional due diligence, Trotter participated in the fraudulent scheme described herein.

(Compl. ¶¶ 62–63) (emphasis added).

At most, plaintiffs suggest that Trotter failed to perform its due diligence when it accepted the sponsor's representations. However, this claim, even if supported by facts, would not rise above the level of negligence absent other facts neither pleaded nor suggested; negligence is insufficient to state a claim for securities fraud. *See O'Brien*, 740 F.Supp. at 281–82; *Friedman v. Arizona World Nurseries*, 730 F.Supp. at 532.

 Courts in this district have repeatedly rejected the existence of an attorney-client relationship as sufficient in itself to provide the factual basis for fraudulent knowledge. *See, e.g., Hayden v. Feldman*, 753 F.Supp. 116, 120 (S.D.N.Y.1990); *Friedman*, 730 F.Supp. at 524. In a recent suit brought against an accounting firm and others based on disclosure about "step-up" property transactions in private placement memoranda used in the sale of real estate limited partnership interests, the Court granted defendants' motions to dismiss plaintiffs' claims—including RICO claims—and noted that

[i]t is important in the context of lawsuits brought against accountants and other financial advisors that fraudulent intent, or recklessness rising to the level of conscious behavior, is required to underpin a claim brought under § 10(b) of the Securities Exchange Act of 1934, or the mail and wire fraud statutes as predicate acts of a RICO offense. Allegations of negligence are insufficient in this regard.

*O'Brien v. Price Waterhouse*, 740 F.Supp. at 280 (citing cases); *see also Friedman v. Arizona World Nurseries*, 730 F.Supp. 521 (S.D.N.Y.1990). Even if Trotter and others should have made further inquiries to attempt to uncover the alleged fraud, " 'failure [to make further inquiries does] not rise above the level of negligence, which is legally insufficient,' " unless facts are alleged which tend to establish knowledge of the fraud. *Id.* (citing cases). That an accounting firm may have conducted an audit and then issued a favorable opinion letter is insufficient to establish knowledge of the fraud. *See, e.g., Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387, 394 (S.D.N.Y.1988) (citing cases). Plaintiffs assume that Trotter's performance was inadequate, but the only facts they point to are that the properties—in a subsequently declining real estate market—were unable to generate payments on the debt. That does not establish fraudulent knowledge by tax counsel.

Rule 9(b) is designed especially to protect reputations, including those of accountants and other professionals, from injury caused by unsubstantiated charges of fraud. *See, e.g., In re Union Carbide Corp. Consumer Products Bus. Sec. Litig.*, 666 F.Supp. 547, 557 (S.D.N.Y.1987). An accusation of fraud is a serious charge and can cause substantial harm to the reputation of a professional organization. Although plaintiffs' RICO claims are not based exclusively on 18 U.S.C. § 1962(c), the Supreme Court held recently, in *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), that one must participate in the operation or management of an enterprise itself in order to be subject to § 1962(c) liability. Plaintiffs have not pleaded facts to support an inference that the Professional Defendants—including Trotter—participated in the alleged fraudulent enterprise.

 Plaintiffs have failed to articulate how the statement by Trotter was false and misleading, especially given the stringent cautionary language contained in the materials. *See Luce v. Edelstein*, 802 F.2d at 56 (statements concerning projections of potential cash and tax benefits which clearly "bespeak caution" found not to support a section 10(b) claim). Plaintiffs do not mention a single specific event that would support an

inference that defendants acted with the required knowledge. Allegations of fraud relating to speculative projections "must allege particular facts demonstrating knowledge of defendants at the time that such statements were false." *Di Vittorio,* 822 F.2d at 1248. Conclusory allegations of a firm's tax expertise do not satisfy the particularity requirements of Rule 9(b) unless other allegations specifically show how or why the expert should have believed the projections to be inaccurate. *See, e.g., Friedman v. Arizona World Nurseries,* 730 F.Supp. 521 (S.D.N.Y. 1990).

Plaintiffs argue that "because defendants knew that the data upon which the financial forecasts were based were false, their issuing of the forecasts was fraudulent." (Pl.Mem. at 13) However, there is absolutely no basis for plaintiff's allegation that any defendant had such knowledge. In *Duke v. Touche Ross & Co.,* 765 F.Supp. 69, 74 (S.D.N.Y. 1991), the Court denied a motion to dismiss by defendant Touche Ross & Co., an accounting firm, and noted that "plaintiffs do not allege that Touche merely gave inaccurate projections and tax opinions. Rather, plaintiffs also indicate that defendants vouched for the good judgment of the partners. This allegation informs the Court that Touche went beyond giving typical accounting advice." *Id.* In contrast, Trotter gave only tax advice, did not issue a supplemental financial projections review and report, and did not vouch for anyone. In fact, Trotter's representations have to do only with the tax aspects of the partnership, and plaintiffs have not claimed any fraud arising from those tax aspects.

Viewed in light of the transactions, the PPMs, and the Trotter tax opinions, plaintiffs' allegations of fraudulent knowledge are "entirely too vague and unspecific to withstand a motion pursuant to Rule 9(b)." *O'Brien v. Price Waterhouse,* 740 F.Supp. at 281.

### 3.

*Reasonable reliance*

 Plaintiffs cannot allege that they reasonably relied on alleged misrepresentations and omissions in the PPMs and tax opinion letters for the same reasons, described above, that they cannot allege that such misrepresentations and omissions were material. Plaintiffs' reliance on the tax opinion letter for an opinion of property value was unreasonable in light of (1) the clear and limited purpose of the tax opinion letter—to set forth tax consequences of the investment, (2) full disclosure of all material facts relating to the partnership acquisition of the property, and (3) disclaimers in the PPMs regarding possible IRS challenges to tax counsel's fair market value assessment of the properties combined with the fact that the IRS is not alleged to have made such a challenge.

First, the medium in which the fair market value statement was made—a tax opinion—prohibits plaintiffs' reliance for a general purpose clearly different from the limited purpose intended. Plaintiffs argue that "[i]t was reasonable for the investors to rely upon the tax opinion letters," and that plaintiffs were encouraged to rely, and did rely, on the tax opinions. (Pl.Mem. at 14; Compl. ¶¶ 61, 65) However, the tax opinion letters were intended to verify certain tax features of the partnerships, none of which plaintiffs claim were misrepresented.

Plaintiffs concede that tax benefits were the primary motivating force behind their investments. (Pl.Mem. at 17) The Trotter statement was made for the purposes of rendering a tax opinion, an opinion concerning the availability of depreciation and deductions to the prospective investor. Plaintiffs argue that this statement "implied" to investors that respective purchase prices approximated fair market value.

Plaintiffs assert that Trotter "implied that it had investigated and expressly represented that it had determined the value by stating that it was satisfied with the representation of the sponsors about value." (Pl.Mem. at 17) However, the Second Amended Complaint contains no allegations to support such an implication. In fact, plaintiffs admit that according to the PPMs "the sponsors were not making estimates of value." (*Id.*) If the sponsors were not *making* such estimates, certainly plaintiffs cannot allege that tax counsel, who was exposed to the same information as plaintiffs, could have *implied* such

estimates; in any case, reliance on such an implication, to the extent it existed, was unreasonable.

Second, plaintiffs cannot rely on statements that the PPMs contradict. "Reliance on statements which are directly contradicted by the clear language of the offering memorandum through which plaintiffs purchased their securities cannot be a basis for a federal securities fraud claim." *Brown v. E.F. Hutton,* 735 F.Supp. at 1203 (quoting *Feinman,* at 170). Plaintiffs cannot allege that they reasonably relied upon the tax opinion for an assessment of the accuracy of explicit disclosure in the PPMs. (*See* Pl. Mem. at 15) (such reliance was "critical to investors"). It is simply unreasonable for plaintiffs to claim they relied on implications of value in a document addressed to tax issues while disregarding explicit disclaimers and warnings in a document addressed among other things to valuation issues. Further, plaintiffs must allege more than that Trotter was an "insider" in constant communication with other defendants; merely alleging that a professional has performed services for other defendants is not sufficient. *Morin v. Trupin,* 711 F.Supp. 97, 110 (S.D.N.Y.1989) (citing cases).

■■■ Plaintiffs assert that the reliance issue was decided in another case involving Southmark—*Steiner v. Southmark Corp.,* 734 F.Supp. 269 (N.D.Tex.1990)—in which the Court denied defendants' motion to dismiss. (Pl.Mem. at 14) However, the allegations in that case related to open market purchases of debt securities, not privately offered investments in limited partnerships. 734 F.Supp. at 272.[5] According to the "fraud-on-the-market" theory, plaintiffs who purchase securities that were traded actively in large markets may be entitled to a presumption of reliance—a court will presume reliance when the defendant's disclosure materially affected the market price of such securities. *Basic, Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988). Because the price of a security

in an open and developed securities market reflects the available material information, misleading statements will defraud buyers of the security even if the purchasers do not rely on the misstatements. 485 U.S. at 241–242, 108 S.Ct. at 989 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3rd Cir.1986). Thus, an investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price, and because most publicly available information is reflected in the market price, an investor's reliance on any public material misrepresentations may be presumed. *See Basic, Inc. v. Levinson,* 485 U.S. at 248, 108 S.Ct. at 992.

In contrast, there is no such justification for a presumption of reliance here, because the partnerships were offered privately and were not traded actively in a large public market. The modern securities markets differ from the face-to-face transactions contemplated by fraud cases prior to *Basic, Inc. v. Levinson.* In face-to-face transactions, such as private limited partnership offerings, the proper inquiry into an investor's reliance is "into the subjective pricing of that information by that investor." *Basic, Inc. v. Levinson,* 485 U.S. at 245, 108 S.Ct. at 990 (quoting *In re LTV Sec. Litig.,* 88 F.R.D. 134, 143 (N.D.Tex.1980). That is the inquiry I have made here.

Third, plaintiffs cannot allege reasonable reliance. As described above, the PPMs warned that although investors could expect economic benefits from tax deductions with near certainty, they could expect only a chance of capital appreciation or cash. Moreover, Trotter warned investors in its tax opinion letters that those letters were intended only as "[a]n opinion concerning certain of the potential federal income tax consequences. . . ." (Burns Ex. A. at A00128)

Plaintiffs claim that these warnings were not sufficient to deter them from relying on the Trotter tax opinion as an assessment of value independent of that in the PPMs, be-

---

**5.** In addition, the Court in *Steiner v. Southmark* limited its holding to a dismissal based on Rule 9(b). The Court "expresse[d] no opinion on the substantive merits of these claims, but has no hesitancy in concluding the allegations are suffi- ciently specific to satisfy the dictates of Rule 9(b)." 734 F.Supp. at 275 n. 4. Here, defendants' moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) as well.

cause "none of those warnings concern[s] the value of the properties that were the crux of the investment." (Pl.Mem. at 18) As explained above, the PPMs contain warnings which relate, either directly or indirectly, to the value of the properties, including the prices paid for the properties by defendants and the prices paid by the partnerships. Again, this is not a case where

> the underlying assumptions of the PPMs, tax opinions and projections were designed to mislead the investors into believing that the partnership investments offered them the opportunity to achieve a profit and a tax benefit from their investment, when in reality defendants knew that these possibilities did not exist. . . .

*Griffin v. McNiff*, 744 F.Supp. 1237, 1254 (S.D.N.Y.1990). Plaintiffs rely mistakenly on *Griffin v. McNiff*, in which the Court *dismissed* most of the fraud claims—including claims against accountants who rendered opinions about the partnerships—but upheld certain limited claims that certain defendants knew the partnerships were entirely fraudulent *and would achieve neither profits nor tax benefits. Id.* There are no such allegations here.

Plaintiffs argue that "[h]ere, because there was no warning that assertions by the offerors and their tax counsel concerning the value of the properties should not be relied upon or trusted, there was no warning sufficient to guard against defendants' misrepresentation." (Pl.Mem. at 20) It is not clear what kind of warning plaintiffs would regard as sufficient. As stated previously, the PPMs contained the kind of warnings that the courts recognize "bespeak caution" about representations of property values for real estate limited partnerships. *See generally Luce v. Edelstein*, 802 F.2d 49 (2d Cir.1986); *Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F.Supp. 521 (S.D.N.Y.1990), *aff'd*, 927 F.2d 594 (2d Cir.1991); *Griffin v. McNiff*, 744 F.Supp. 1237 (S.D.N.Y.1990). The PPMs are laden with disclaimers to warn of potential risks.

■■■ Obviously, real estate limited partnership tax shelter investments are risky, and courts should and do require such disclaimers. But to require, as plaintiffs suggest, that tax counsel and sponsors warn potential investors that tax counsel is not to be "trusted" would render meaningless any disclosure counsel might make. This Court will not require that tax counsel simultaneously explain the tax implications of an investment *and* disclaim that explanation to avoid liability for any non-tax implications the explanation might have.

■■■ Rather, liability should and does depend on whether plaintiff has alleged fraud. The content of the warnings is important. For example, if plaintiff alleges that forecasts were misleading, then a simple statement cautioning that the forecasts are just forecasts is sufficient. On the other hand, if the allegations are that the entire transaction was fraudulent, then no amount of warning is sufficient. *Luce v. Edelstein*, 802 F.2d at 49. As in *Luce v. Edelstein*, the courts employ a sliding scale to determine if warnings are sufficient to disclaim allegations that fall between these two extreme examples. To the extent a plaintiff can allege more compelling facts to demonstrate fraudulent intent, courts give less weight to warnings about disclosure, and require that warnings be broadly-worded to survive a motion to dismiss. Accordingly, this Court follows this practice of balancing, and rejects plaintiffs suggestion that one can avoid liability only by disclaiming all of a statement's possible implications.

Finally, in support of their argument that Trotter's statements about property value were false, plaintiffs argue that information about property prices was "buried in the offering memoranda." (Pl.Mem. at 22) Plaintiffs have an unusual notion of what it means for information to be "buried." In fact, such information is the first item disclosed in each of the PPMs—after risk factors—and the disclosure is in great detail over several pages.

What *is* "buried" is any implication in either the PPMs or the Trotter tax opinions that Trotter had "special knowledge" of the transactions and the values of the partnership properties. (Pl.Mem. at 22) To exhume such an assertion from the offering documents and then rely on that "special knowl-

edge"—if in fact plaintiffs did so—was unreasonable.

In sum, "given all of the cautionary language, [Trotter's] tax opinion cannot be read to mean that [Trotter] undertook to make representations of any kind regarding the value of the [properties]." *See Friedman v. Arizona World Nurseries, Ltd.*, 730 F.Supp. at 541 (dismissing claims against firm that wrote tax opinion letter for real estate limited partnerships based on "step-up" transactions). To the extent plaintiffs relied on tax opinions as representing such values, that reliance was not reasonable. *See, e.g., Friedman*, 730 F.Supp. at 541.

Although plaintiffs cite Treasury regulations which recognize the importance of tax opinions, (Pl.Mem. at 15) plaintiffs do not allege any misstatements or omissions relating to tax issues. Accordingly, plaintiffs may not rely on cases that upheld fraud claims based on false tax consequences. *See, e.g., Stevens v. Equidyne Extractive Indus. 1980, Petro Coal Program 1*, 694 F.Supp. 1057 (S.D.N.Y.1988). Plaintiffs do not complain at all about disclosure in the PPMs and the tax opinions about the tax deductibility of their investments—presumably because the partnerships generated abundant tax deductions. Moreover, the PPMs warned plaintiffs that the IRS could challenge the fair market value assessment of the properties. These warnings were made in the Income Tax section of each PPM and tax opinion. Importantly, the IRS is not alleged to have challenged any fair market value assessment.

For the above reasons, plaintiff has failed to allege any predicate act of securities fraud to support a RICO violation.

### B.

To state a claim for violation of the federal mail fraud statute, plaintiffs must show the existence of a scheme to defraud and a knowing use of the mails to execute the scheme. 18 U.S.C. § 1341. As with Section 10(b), the mail fraud statute requires a showing of an intent to defraud, or reckless conduct rising to the level of intentional behavior. *See O'Malley v. New York City Transit Authority*, 896 F.2d 704, 706–07 (2d Cir.1990).

Plaintiffs' mail fraud claim is based on the same allegations as those underlying their securities fraud claim. Plaintiffs allege that defendants committed mail fraud

> in the preparation or the dissemination through the means and instrumentalities of the United States mail of materially false and misleading documents, including placement memoranda, sales brochures and other communications, issued in connection with the sale of securities to the plaintiffs....

(Compl. ¶ 73) Therefore, for the reasons stated above, plaintiffs' has not stated a mail fraud claim either. *See Griffin v. McNiff*, 744 F.Supp. 1237, 1255 (S.D.N.Y.1990) (court's conclusion that plaintiffs failed to state adequately a claim for securities fraud mandated a similar dismissal of RICO claim predicated on mail and wire fraud).

In particular, as I indicated above, plaintiffs have not alleged facts which give risk to a strong inference that any defendant acted with the required fraudulent intent in activities related to the limited partnerships. Moreover, as required by Rule 9(b), plaintiffs do not plead particulars as to any defendants in their sole mail fraud allegation. (Compl. ¶ 73)

### V.

■ Because plaintiffs have not alleged any predicate act to support a private cause of action under RICO, their claims must be dismissed. However, I note briefly that even had plaintiffs alleged the required predicate acts, plaintiffs' claims would not survive RICO's pleading requirements. Among other things, plaintiffs has failed to plead proximate causation.

To state a cause of action under RICO, 18 U.S.C. § 1962, plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). In other words, racketeering activity is the commission of certain predicate acts, specified in the RICO statute, for which a defendant could be convicted, *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. at 488, 105 S.Ct. at 3280–81,

and a pattern of activity requires proof of at least two such acts, 18 U.S.C. § 1961(5), "that were related and that amounted to or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

Plaintiffs must have been injured "by reason of" defendants' illegal activity. 18 U.S.C. § 1964(c). "The phrase 'by reason of' requires that there be a causal connection between the prohibited conduct and plaintiff's injury." *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1311 (2d Cir. 1990) (quoting *Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634, 636 (2d Cir. 1989)).

Plaintiffs must plead "not only that the defendant's violation was a 'but for' cause of [its] injury, but was the proximate cause as well." *Holmes v. Sec. Investor Protection Corp.,* —— U.S. ——, ——, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992) (plaintiff must prove "a direct relation between the injury asserted and the injurious conduct alleged"); *see also Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285; *County of Suffolk,* 907 F.2d at 1311; *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990) ("[b]y itself, factual causation (*e.g.,* 'cause-in-fact' or 'but-for' causation) is not sufficient"); *Ceribelli v. Elghanayan,* 990 F.2d 62, 65 n. 3 (2d Cir. 1993) (citing *Holmes v. Sec. Investor Protection Corp.,* —— U.S. at —— – ——, 112 S.Ct. at 1316–18; *Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 20–22 (2d Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987)). In the Second Circuit,

> the RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence.

*Hecht v. Commerce Clearing House, Inc.,* 897 F.2d at 23–24.

Plaintiffs allege in conclusory language that they suffered and continue to suffer injury "as a result of" defendants' racketeering activity. (Compl. ¶¶ 78, 80, 85) However, plaintiffs do not allege any facts to support this conclusion. In other words, plaintiffs do not allege what caused their alleged injury.

Several factors other than the alleged misrepresentations and omissions could have caused injury to plaintiffs. *See First Nationwide Bank v. Gelt Funding, Inc.,* No. 92 Civ. 0790, 1992 WL 358759, 1992 U.S.Dist. LEXIS 18278 (S.D.N.Y. Nov. 30, 1992). In fact, plaintiffs' sole allegation as to causation is that Southmark's bankruptcy was caused by "Charles Keating's attempt to cash Lincoln's Southmark issued junk bonds." (Compl. ¶ 77) To the extent Southmark's bankruptcy is relevant at all, this allegation suggests one factor other than defendants' alleged fraud that contributed to plaintiffs' losses.

In addition, plaintiffs have not alleged that the representations in the PPMs were substantially different from the true market value. Unless the true market value of the properties was significantly lower than the value disclosed in the PPMs, plaintiffs cannot allege injury from paying too much for partnership property that subsequently declined in value. This is especially true because the time between the alleged misstatements and injury was considerable—at least several years, and an external factor—the collapsing real estate market—contributed to the decline in the value of the partnership properties.

Plaintiffs have not alleged facts to support a RICO claim.

## VI.

■ Finally, defendants move for sanctions, pursuant to Fed.R.Civ.P. 11. Rule 11 provides

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or

to cause unnecessary delay or needless increase in the cost of litigation.

Fed.R.Civ.P. 11. As plaintiffs request and as the Second Circuit requires, I have used an objective standard to determine whether to impose sanctions. *See Calloway v. Marvel Entertainment Group*, 854 F.2d 1452 (2d Cir. 1988), *rev'd on other grounds sub nom. Pavelic & LeFlore v. Marvel Group*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

In *Kushner v. D.B.G. Property Investors, Inc.*, 793 F.Supp. 1161, 1181–82 (S.D.N.Y. 1992), Chief Judge Griesa awarded defendants sanctions of $25,000 in a case substantially similar to this one. Plaintiffs argue that *Kushner* was different because "[t]here, plaintiffs' counsel served twenty-seven virtually identical complaints, each with little attention to the facts of each particular offering [and thereby caused] the court to question whether . . . counsel had even read the offering memoranda." (Pl.Mem. at 42) However, it is worth quoting what Judge Griesa stated "caused" him to award sanctions:

> Each complaint is as groundless as the next. Each ignores the substantial disclosure in the private placement memoranda. Indeed, it seems impossible that the drafters of these complaints could have read the memoranda. If they had read the memoranda, they would have discovered that their allegations were entirely frivolous. No set of facts has been pleaded which gives rise to any inference that fraud has been committed.

*Kushner*, 793 F.Supp. at 1161. Plaintiffs claim that "counsel has thoroughly investigated and uncovered the misrepresentations and material omissions of the offering memoranda." (Pl.Mem. at 42) Such "thoroughness" does not appear from plaintiffs' pleadings and memoranda—for example, plaintiffs assert repeatedly that facts clearly disclosed in the PPMs were either not disclosed or "buried." Nevertheless, the basis for sanctions in this case is not merely the carelessness of plaintiffs' counsel in making "reasonable inquiry." Rather, it is that plaintiffs resubmitted groundless claims after a direct admonition, and thereby "cause[d] unnecessary delay [and] needless increase in the cost of litigation." Fed.R.Civ.P. 11.

Therefore, the above quote from *Kushner* fits this case if I substitute "heeded a warning" for "read the memoranda." At the April 7, 1992 conference, I allowed plaintiffs to amend again, but noted specifically that the PPMs recited facts that plaintiffs claimed had not been disclosed, and that plaintiffs must allege more than that prices of properties acquired by the partnerships had been "stepped-up"—a fact disclosed in the PPMs. Indeed, it seems impossible that the drafters of these complaints could have heeded that warning. If they had, they would have discovered that their allegations were without basis.

In their third attempt to plead, plaintiffs managed no better than to condense their previous groundless claims into fewer pages. That plaintiffs' new complaint is shorter does not make it any less frivolous. Brevity, if I recall correctly, was not their idea; it was mine. Of course, as plaintiffs point out, courts should not "stifle creative legal argument" and should "avoid hindsight and resolve all doubts in favor of the signer." *Calloway*, 854 F.2d at 1469. However, the Second Amended Complaint is not creative legal argument; it is at best creative editing. It contains no new argument. It merely pares the previous 500 pages of allegations to manageable size.

Because plaintiffs have compelled defendants to restate what was already manifest in the PPMs, under the circumstances, sanctions should be awarded to compensate defendants to some extent for their efforts in making their most recent motions, and to deter plaintiffs' counsel and others from similar conduct.

Defendants have not requested a specific amount or provided information about time spent or expenses, except that "[t]his has consumed valuable resources of counsel." (Def.Mem. at 37) If the parties are unable to agree on an appropriate sanction, defendants are to submit to this Court by May 7, 1993 a statement of costs incurred in responding to plaintiffs' Second Amended Complaint, which statement is to conform to the requirements of *New York State Assoc. for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d

Cir.1983). The amount of sanctions will be determined at a future date.

\* \* \*

"The securities laws were not enacted to protect sophisticated businessmen [and women] from their own errors of judgment. Such investors must, if they wish to recover under federal law, investigate the information available to them with the care and prudence expected from people blessed with full access to information." *Hirsch v. du Pont*, 553 F.2d 750, 763 (2d Cir.1977); *see also Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011 (2d Cir.1989).

For the reasons stated above, plaintiffs RICO claims against all defendants are dismissed. Because diversity jurisdiction does not exist in this case, the common law fraud and state statutory claims are dismissed as well. Defendants' motion for sanctions is granted, as described above.

SO ORDERED.